**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

JAMES RUSSELL,                          :
                                        :
            Petitioner,                 :          Civ. No. 20-1312 (PGS)
                                        :
      v.                                :
                                        :
STEPHEN JOHNSON, et al.                 :          **OPINION**
                                        :
            Respondents.                :
_____:

## PETER G. SHERIDAN, U.S.D.J.

### I.  INTRODUCTION

Petitioner, James Russell ("Petitioner" or "Russell"), is a state prisoner proceeding _pro se_ with an amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. (ECF No. 8.) For the following reasons, the amended petition is denied and a certificate of appealability shall not issue.

### II. FACTUAL AND PROCEDURAL BACKGROUND

The factual background giving rise to Petitioner's judgement of conviction was stated by the New Jersey Superior Court, Appellate Division during Petitioner's direct appeal as follows:[1]

---

[1] The Appellate Division consolidated Petitioner's and his codefendants', Jamell D. Scott, Lee C. Reeves, and Trishawn F. Cochran, direct appeals. All three individuals challenged "their convictions and sentences following a joint jury trial involving charges related to a plot to silence a witness to a prior murder." (ECF Nos. 30-35 and 30-36, _State v. Scott, Reeves, Russell, and Cochran_, Nos. A-2580-09T1, A-4100-09T1, A-4101-09T1, A-6279-09T3,

## A. The Olivares Murder Proceeding

The following facts are derived from the trial record. In February 2006, Christian Vivar Granados was an eyewitness to a violent incident that led to criminal charges against Scott, Russell, and Tyleek Baker relating to the murder of Jose Francisco Olivares in a Lakewood barbershop. During his 9-1-1 call, Granados identified one of the participants by nickname and first name. He also gave statements to the police and identified all three participants in photographs.

Granados's name and address appeared in the police reports and other documents produced during discovery in the Olivares murder proceeding. At a plea cut-off hearing in August 2008, Scott and Russell acknowledged that they had reviewed the discovery materials with their attorneys. The court set the trial date for September 15, 2008.

Jury selection began on September 17, 2008. On October 7, 2008, the trial judge advised the defendants that opening statements and witness testimony would begin on October 14, 2008.

## B.  The Plan to Silence Granados

According to Joseph Powell, on September 13, 2008, he was instructed by Shawn Craighead, a fellow gang member then incarcerated in the Ocean County Jail, to contact gang leader Cochran. When Powell met Cochran a few days later, Cochran told Powell that he was about "to take care of some bitch," which Powell understood to mean an unnamed witness. Cochran later confided that he had learned the witness's address – "in the Congress" - and if Powell spoke with Scott or Russell (who were incarcerated in the Ocean County Jail awaiting trial for the

---

slip op., at 3 (N.J. Super. Ct. App. Div. April 16, 2013). To avoid confusion, this Court will short cite to the New Jersey Appellate Divisions direct appeal Opinion as *Russell*, No. A-4101-09T1, slip op.

Olivares murder), Powell should tell them Cochran was "still working on that problem."

Soon enough, Powell spoke again with Cochran, telling him that Scott and Russell kept calling him. Cochran responded that "if [you] talk[] to [them], to let [them] know that the situation is taken [sic] care of. That [Reeves] was going to take care of it in the Congress. But if [you] talk[] to him [sic], don't mention [Reeves] or the Congress."

On Friday, October 10, 2008, Russell called Powell. The following verbatim exchange, captured on an audio recording, occurred:

[Russell]: Big bro bust at you and told you tell "Brave" [Cochran] that shit?
[Powell]: About the pants, right?
[Russell]: Yeah.
[Powell]: Word.
[Russell]: Yeah, I know that like, that's like top priority, ya hear.
[Powell]: Word, I told 'em I'd let him have that by Sunday and shit.
[Russell]: Yeah, na, but ah, motherfucker ah, tell "Brave" ta ah, tell "Brave" "Big Bro" said, tell, tell "Brave" "Big Bro" said, "Handle that CVS thing[,]" ya heard?
[Powell]: CVS thing ya said?
[Russell]: Yeah.
[Powell]: A-ight[.]
[Russell]: He be knowin', he be knowin' what it is en shit.
[Powell]: Word.
[Russell]: Ya tell 'em niggers you know what I mean, throw, throw a barbeque and speak about that shit.
[Powell]: No doubt.
[Russell]: Yeah, Nig, niggers goin' have ta fight this war on Tuesday, ya heard?
[Powell]: Yeah, I'm gonna be up there Tuesday.

[Russell]: Yeah, I know that. Yeah, we just, we just wavy right now man. I mean I got this thing in neutral patiently waitin' (inaudible) know what I mean?
[Powell]: Word.

In another tape-recorded conversation on the afternoon of Monday, October 13, 2008, Scott told Powell: "Bust that 'Brave' that nigger you know what I mean ta handle that shit you know what I mean, he knows what to do with that shit." Powell replied: "He's hittin' me back," and Scott answered: "A-ight, I'll be at ya later on tonight and shit." Powell testified that "Bust that 'Brave'" meant to call Cochran, and the reference to "handle that shit" referred to "[t]he situation with the witness."

Approximately one hour later, Russell telephoned Powell. Russell asked if Powell knew whether Cochran had "handle[d] that shit." Powell replied that he had talked to everyone but Cochran. Russell responded: "Motherfucka you know niggers tryin', you know what I mean, take it, take it ta a different level, ya heard?" Powell explained that Russell was asking if he had taken care of the witness situation and telling him to "get the job done."

After Tuesday, October 14, 2008, Powell stopped taking telephone calls from any street gang member in the Ocean County Jail. He testified that he was "afraid of getting caught up between the murder with the phone calls."

### C. The Vazquez Murder

On Tuesday, October 14, 2008, Granados was staying with his girlfriend, Alisa Morales, and her mother, Thelma Vazquez, at the Congress Apartments in Lakewood. Prior to that day, a defense investigator had visited a different address listed for Granados in the Olivares discovery materials and was directed by Granados's mother to reach Granados at the Congress Apartments.

Shortly before 6:00 a.m., Vazquez was sleeping on the sofa in the living room when the household's dog began barking. Morales and Granados, who were in the bedroom, heard Vazquez call for the dog and ask, "Que lo que?" Then they heard gunshots. Upon entering the living room, they saw the front door open and Vazquez bleeding on the sofa. While Granados called 9-1-1, Morales ran outside in an effort to get a glimpse of the shooter, but she did not see anyone.

Within moments, Lakewood Police Officer Robert Anderson received a dispatch call to respond to a shooting at Vazquez's apartment. Upon entering the unit, he observed Vazquez with multiple bullet wounds. The front door was "pushed in" and "busted off" the jam, and wood was missing under the striker plate. Vazquez was taken by ambulance to nearby Kimball Medical Center, where she died.

### D. The Ocean County Jail Investigation

On the same day as Vazquez's murder, Sergeant Joseph Valenti of the Ocean County Department of Corrections coincidentally learned of a security threat involving contraband razor blades in the East E section of the Ocean County Jail. While correction officers searched inmates and cells, Valenti accessed and listened to tape-recorded telephone calls made by inmates between October 8 and 14, 2008, "to see if [he] could see if somebody had something to do with the four razor blades that were going to be used to cut up possible officers."

Valenti testified that all telephone calls by inmates were routinely tape-recorded and monitored for security threats. Upon entering the jail, inmates completed a form listing five people they wished to call, plus one attorney. Inmates then received a personal identification number (PIN), which they had to enter into the telephone system before placing a telephone call. Each PIN was traceable to the inmate's housing assignment.

5

As he reviewed the records of telephone calls and their associated PINs, Valenti noticed that inmate Perfecto Salgado, housed in the jail's North C section, appeared to be making telephone calls from the East E section even though he was not housed there. When Valenti listened to the recordings of telephone calls made with Salgado's PIN, Valenti identified the voices of inmates Russell, Scott, and Craighead. Valenti verified the actual callers' identities by viewing video recordings taken from cameras inside the jail.

Valenti knew that Russell and Scott were on trial first-degree crime in the Olivares murder proceeding, and that someone very close to a key witness in that trial was shot and killed earlier that day. Valenti testified that Salgado and Scott were housed in the same jail section from November 22, 2007, through December 3, 2008, and that Scott and Craighead were cellmates from September 6, 2008, through November 6, 2008.

Valenti became alarmed after listening to one of Russell's telephone calls that occurred on October 9, 2008. In that conversation Russell told the other person that something had to be done by Tuesday before the trial: "it's gotta be done by Sunday, Monday the latest 'cause niggers go to court Tuesday, you dig." Valenti contacted Ocean County Prosecutor's Office Investigators Carlos Trujillo-Tovar and Casey Long to advise them of a possible connection between the jailhouse conversations and Vazquez's murder.

Long obtained a court order to review additional telephone conversations using Salgado's PIN from September 2 through October 17, 2008. There were ninety-five telephone calls involved, but Long believed only eight were relevant to the murder of Vazquez. The number was later pared for trial.

Salgado denied using the telephone at the jail, explaining that his family lived in Mexico. Moreover, he confirmed that he did not fill out the PIN request form or sign it. He testified that Scott — known to Salgado as "Cinco" — had completed and signed the form. Scott also filled out the information on two "Telephone Delete Add Request" forms, which Salgado admittedly signed. Salgado was not familiar with any of the names or telephone numbers on those forms.

### E. The Shooter

Wenda Guzman testified that on the night before Vazquez's shooting, Reeves slept on the futon in the living room of Guzman's apartment. Shortly before 6:00 a.m. on October 14, 2008, Reeves asked Guzman "to take a walk with him so he [could] fulfill an order." During the walk, Guzman noticed the handle of a gun at Reeves's waist. When she asked him about the gun and the order he was going to fulfill, Reeves would not give her a straight answer. Guzman decided to go home and left Reeves when he turned onto Congress Street.

Reeves returned to Guzman's apartment a few minutes later. Guzman testified that he looked "just fine." He took a shower, asked for a change of clothes, went to sleep on the futon, and left the apartment in the early afternoon.

That same day, James Wallace received a telephone call from Reeves, asking to meet him. Reeves had previously told Wallace "he had to put some work in at the Congress" with "some Spanish cat." When they first met after the shooting, Reeves told Wallace that he had gone to the witness's apartment, kicked in the door, and started shooting until the gun jammed.

Around this time, Reeves gave Wallace a nine-millimeter Smith and Wesson handgun. Wallace wrapped the handgun in a t-shirt, and hid it in his backyard until Reeves asked for it.

Reeves's live-in girlfriend, Shaunita Foskey, learned of the Vazquez homicide on October 14, 2008, which happened to be her birthday. The next day, Reeves told Foskey that he wanted to tell her something "[a]bout the Congress" and "[t]hat lady." Foskey replied, "I don't want to hear nothing."

Around October 17, 2008, Reeves spoke again with Guzman. According to her account, "[h]e pulled me to the side, let me know that the whole order has been fulfilled, and then he proceeded to explain of what his action[s] were of that night." Specifically, Reeves said that "he kicked down the door, let off shots, the gun jammed and he took off running."

Also around this time, Reeves asked Wallace to return the handgun. The weapon, still wrapped in a t-shirt, ended up with Reeves at Foskey's dwelling. She testified that Reeves cleaned the handgun and removed "the dirt from the hole [meaning the barrel] of the gun" with an old toothbrush. As Reeves was cleaning, she saw a copper-looking shell casing inside the handgun. Reeves removed the casing, wrapped it in a tissue, and stated, "without the casing, they don't have anything."

Foskey then listened as Reeves told her "the whole story." He explained that "his Big Homey said the witness had to go," meaning he was ordered to kill a witness, and "he had to do what [he] had to do." Reeves admitted to Foskey that he kicked Vazquez's door open, shot whoever was on the couch, and ran off when the gun jammed. Only later did Reeves realize that he shot the wrong person, saying he meant to shoot the "lady's son-in-law," who was "supposed to have been the witness." Sometime after that, he and Foskey went to Camden, where Reeves dropped the shell casing into a street drain.

During the early morning hours of October 22, 2008, Reeves, Wallace, and Stephanie Tansley decided to drive

to a liquor store. On the way, Reeves told Tansley — in confidence — that "he went to this house, kicked down the door, had a gun in his shirt and shot," and that he ran when the gun jammed. He asked her if she wanted to go there, and Tansley said yes. Tansley then drove Reeves and Wallace to the Congress Apartments.

Wallace testified that Reeves wanted to show Tansley where he had killed "that bitch at." Leaving Wallace in the car, Reeves and Tansley walked up the stairs to Vazquez's apartment, at which time Tansley saw a police officer in a marked police vehicle below them. They "ran down the stairs and went back into the car," and Tansley drove them to a bar and liquor store before heading to another friend's house.

Lakewood Police Officer Kevin Doyle testified that he was on patrol that morning in the area of the Congress Apartments. At about 1:45 a.m., he noticed a vehicle — "the only vehicle on the street at this time" — moving at a high rate of speed. He followed at a distance and watched it enter the Congress Apartments complex. He found the vehicle parked in front of Vazquez's apartment, and observed a black male and white female standing directly in front of the apartment unit's door. After he drove by, he saw the two individuals immediately return to their vehicle and drive away.

After losing sight of the car, Doyle noticed it approximately thirty minutes later. He followed, and eventually pulled it over. He identified Tansley as the driver, Reeves as the front-seat passenger, and Wallace as the rear-seat passenger. He asked each of them why they went to the apartment and whether they knew about the murder. Reeves told Doyle that he was visiting a friend who lived there, giving the police officer a "bogus name." The officer allowed Reeves and the others to leave.

The same day, Reinaldo Feliciano was stopped by a state trooper in Lakewood for a motor vehicle violation and was

taken to the Lakewood police headquarters. There, he was interviewed by investigators from the Ocean County Prosecutor's Office because he indicated that he had information about the Vazquez shooting. He explained that the weekend before the shooting, Reeves said he needed a ride "to go take care of the bitch . . . [b]efore they [sic] get on the stand to testify . . . against one of his homies." According to Feliciano, Reeves said that if he did not get the job done, he would be disciplined — beaten while surrounded — by his fellow street gang members. Feliciano also stated that Reeves called him the day after the shooting and told him the job was done and "he needed a ride out of town . . . because it was too hot for him to be around." The following day, Reeves told Feliciano in person that "he killed the bitch, and that his gun jammed and he bounced."

In December 2008, Foskey provided information about the location of the shell casing in Camden, which the police recovered from beneath the sewer grate in short order. Several months later, further investigation resulted in the recovery of a nine-millimeter Smith and Wesson handgun, which was forensically linked to the shell casing recovered in Camden and a shell casing found at the scene of Vazquez's shooting.

### F. Reeves's Testimony

Reeves testified at trial. He freely admitted that he murdered Vazquez. Cochran, Scott, and Russell did not testify or call any witnesses.

Reeves told the jury that Powell recruited him into the Bloods by "jumping me in," meaning he suffered a beating and bled. At the beginning of October 2008, Reeves said that Powell ordered him to kill a witness, and threatened to "DP" him if he refused. Reeves explained that "DP" meant "dependent upon how serious the infraction is that you do, basically me not killing somebody would mean that I would get killed." When Feliciano tried to talk him

out of committing the crime, Reeves told him that the shooting had to be done or it would "come back on me."

Reeves testified he did not mean to kill Vazquez, calling it "an accident," but said he had to do it. He thought the victim was Granados because it was dark inside the apartment. Reeves knew that what he did was wrong and that he deserved to spend time in prison.

Although Reeves admitted telling Guzman and Wallace that Scott was his Big Homey, at trial he maintained that his Big Homey was Powell. Reeves conceded that he told Wallace that he "received orders from [his] [B]ig [H]om[ey] to take care of a witness for [the] [B]ig [H]om[ey]'s trial." He also admitted telling Feliciano, Clark, and Guzman that his Big Homey was in jail, which Powell was not.

Reeves confirmed that he tried to take Feliciano with him when he did the shooting. He admitted telling Feliciano that he "had to take care of some bitch before the bitch got on the stand to testify against one of [his] homies." He explained that "the bitch" referred to Granados, because he was "a snitch." Likewise, he admitted telling Wallace that he had "to put in work on some Spanish cat in the Congress."

### G. Rebuttal Testimony

The State presented Guzman, Foskey, and Wallace as rebuttal witnesses. Guzman said Reeves told her in August 2008 that Scott was his Big Homey. He also told her that the order to kill the witness originated with Scott and that it was handed to him down the street gang's chain of command. Reeves never told her that he had been threatened with discipline. Foskey and Wallace similarly testified that Reeves told them Scott was his Big Homey. According to Foskey, Reeves said that Scott sent word that the witness "had to go."

*Russell*, No. A-4101-09T1, slip op., at 4-18.

On October 28, 2009, Petitioner was found guilty of first-degree conspiracy to commit murder, first-degree murder, two counts of attempted murder, second-degree burglary, second-degree conspiracy to commit witness tampering, and first-degree witness tampering. (*See* ECF No. 30-30, Sentencing Tr. at 59:1-12.) On December 1, 2009, after merging certain counts, Petitioner was sentenced to a term of life imprisonment without parole on the murder conviction, and the lesser sentences on the remaining counts were to run concurrent thereto. The court ordered these sentences be served consecutive to those Petitioner was then serving for other crimes. (*See id.*, at 54:21 to 55:4, 60:10 to 61:16.)

Petitioner filed a direct appeal. The Appellate Division affirmed the judgement of conviction on April 16, 2013. *Russel*, No. A-4101-09T1, slip. op. The New Jersey Supreme Court denied certification on Petitioner's direct appeal. (ECF No. 30-37, *State v. Russell*, 76 A.3d 544 (N.J. 2013)).

Petitioner filed a post-conviction relief ("PCR") petition. On April 29, 2016, following a hearing, the PCR court denied his petition. (*See* ECF No. 30-42.) Petitioner appealed, and the Appellate Division affirmed the denial on May 15, 2019. *State v. Russell*, No. A-5319-15T2, 2019 WL 2114762 (N.J. Super Ct. App. Div. May 15, 2019). The New Jersey Supreme Court then denied Petitioner's petition for certification. (ECF No. 30-52.)

Petitioner filed his original habeas petition on February 7, 2020. (ECF No. 1.) Petitioner then filed the instant amended habeas petition on March 26, 2020. (ECF No. 8.) Respondents filed an answer. (ECF No. 14.) Petitioner filed a reply. (ECF No. 38.)

## III.  LEGAL STANDARD

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254 provides, the district court "shall entertain an application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." Habeas petitioners bear the burden of establishing their entitlement to relief for each claim presented in a petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013). District courts are required to give great deference to the determinations of the state trial and appellate courts. *Renico v. Lett*, 559 U.S. 766, 772–73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for writ of habeas corpus unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States: or

13

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"Contrary to clearly established Federal law" means the state court applied a rule that contradicted the governing law set forth in U.S. Supreme Court precedent or that the state court confronted a set of facts that were materially indistinguishable from U.S. Supreme Court precedent and arrived at a different result than the Supreme Court. *Eley*, 712 F.3d at 846 (*citing Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, 575 U.S. 312, 316 (2015). An "unreasonable application" of clearly established federal law is an "objectively unreasonable" application of law, not merely an erroneous application. *Eley*, 712 F.3d at 846 (*quoting Renico*, 559 U.S. at 773). As to 28 U.S.C. § 2254(d)(1), a federal court must confine its examination to evidence in the record. *Cullen v. Pinholster*, 563 U.S. 170, 180–81 (2011).

"When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods*, 574 U.S. at 316. Where a petitioner challenges an allegedly erroneous factual

14

determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Furthermore, "[w]hen a state court arrives at a factual finding based on credibility determinations, the habeas court must determine whether that credibility determination was unreasonable." *See Keith v. Pennsylvania*, 484 F. App'x 694, 697 (3d Cir. 2012) (citing *Rice v. Collins*, 546 U.S. 333, 339 (2006)).

Finally, to the extent that a petitioner's constitutional claims are unexhausted and/or procedurally defaulted, a court can nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2). *See Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007) ("Here, because we will deny all of [petitioner's] claims on the merits, we need not address exhaustion"); *Bronshtein v. Horn*, 404 F.3d 700, 728 (3d Cir. 2005) (considering procedurally defaulted claim, and stating that "[u]nder 28 U.S.C. § 2254(b)(2), we may reject claims on the merits even though they were not properly exhausted, and we take that approach here").

## IV.  DISCUSSION

### A. Ground One

In Ground One, Petitioner argues that the trial court erred in denying Petitioner's motion for change of venue. (ECF No. 8 at 7-9.) Petitioner contends that

the pretrial publicity from the related "barbershop murder"[2] was too prejudicial and required a change of venue. On direct appeal, the Appellate division denied this claim as meritless for the following reasons:

> To assure impartiality in criminal trials, courts must excuse potential jurors who have formed an ***opinion*** as to the defendant's guilt or innocence. *State v. Williams*, 93 N.J. 39, 61, 459 A.2d 641 (1983). "Only if it is demonstrated that 'the juror can lay aside his [or her] impression or ***opinion*** and render a verdict based upon the evidence presented in court' will extraneous exposure to the facts of the case not be grounds for automatic disqualification." *Ibid.* (quoting *State v. Sugar*, 84 N.J. 1, 23, 417 A.2d 474 (1980)).
>
> . . .
>
> Courts distinguish between "'cases in which the trial atmosphere is so corrupted by publicity that prejudice may be presumed, and cases in which pretrial publicity, while extensive, is less intrusive, making the determinative issue the actual effect of the publicity on the impartiality of the jury panel.'" [*State v. Nelson*, 173 N.J. 417, 475, 803 A.2d 1 (2002)] (quoting *State v. Biegenwald*, 106 N.J. 13, 33, 524 A.2d 130 (1987)).
>
> Cases involving presumed prejudice "are relatively rare and arise out of the most extreme circumstances." *State v. Koedatich*, 112 N.J. 225, 269, 548 A.2d 939 (1988), cert. denied, 488 U.S. 1017, 109 S. Ct. 813, 102 L. Ed. 2d 803 (1989). They involve situations where the community has been saturated with inflammatory and prejudicial pretrial publicity, and there has been an insufficient effort to "root out" jurors exposed to it. [*State v. Harris*, 156 N.J. 122, 153, 716 A.2d 458 (1998), cert. denied, 532 U.S. 1057, 121 S. Ct. 2204, 149 L. Ed. 2d 1034 (2001).] Such

---

[2] Petitioner's reference to the "barbershop murder" refers to the Oliveras murder. The Court will refer to that murder trial as the Oliveras murder trial.

16

publicity may include editorial *opinions* on a defendant's guilt or innocence, or media pronouncements on a defendant's "deathworthiness." *Id. at 144-48*. Thus, there must be a deluge of media activity that creates "a carnival-like setting in which 'the trial atmosphere is so corrupted by publicity that prejudice may be presumed.'" *Id. at 143* (quoting *Biegenwald*, *supra*, 106 N.J. at 33). To determine whether presumed prejudice exists, a court is obliged to consider such factors as:

> (1) evidence of extreme community hostility against defendant;
> (2) prominence of either the victim or defendant within the community;
> (3) the nature and extent of news coverage;
> (4) the size of the community;
> (5) the nature and gravity of the offense; and
> (6) the temporal proximity of the news coverage to the trial.

> [*Nelson*, *supra*, 173 N.J. at 476.]

Where prejudice is not presumed, "a court must evaluate whether under the totality of circumstances 'the jury process resulted in a fair and impartial jury' to determine if a change of venue is necessary to overcome the realistic likelihood of prejudice." *Ibid.* (quoting *Koedatich*, *supra*, 112 N.J. at 274). To determine actual bias as a result of pretrial publicity, the court relies on a voir dire examination of the jurors. *Koedatich*, *supra*, 112 N.J. at 274. An appellate court gives special deference to a trial court's determination regarding jury bias, and ordinarily will affirm absent an abuse of discretion. *Nelson*, *supra*, 173 N.J. at 476-77.

This case is not one of these rare situations where prejudice may be presumed due to a circus-like, inflammatory atmosphere. The nature and extent of the news coverage did not demonstrate presumed prejudice. News reports that simply recite the charges against the

17

accused and present an outline of facts alleged in the indictment are not unduly prejudicial. *Harris*, *supra*, 156 N.J. at 142. Criminal defendants are not entitled to jurors who are totally ignorant of the facts and issues in their case. *State v. Harvey*, 151 N.J. 117, 211, 699 A.2d 596 (1997), cert. denied, 528 U.S. 1085, 120 S. Ct. 811, 145 L. Ed. 2d 683 (2000).

There was no evidence of extreme community hostility, given the jurors' vague recollections of the underlying facts in the Olivares matter. Neither defendants nor Vazquez were prominent members of the community. Thus, despite the gravity of the charges, the majority of factors in *Nelson* weigh in favor of the State's position. Likewise, there was no actual prejudice. The trial court specifically questioned each juror about knowledge of another multi-defendant trial in Ocean County within the last two years where defendants faced the prospect of life imprisonment. For jurors who answered in the affirmative, the court made further inquiries into their knowledge of the previous case, their source of information, and their ability to remain fair and impartial. The court excused any potential juror who revealed prejudicial exposure or indicated an inability to remain impartial. It also repeatedly informed jurors of their duty to avoid any news articles or broadcasts. Jurors are presumed to follow the court's instructions. *State v. Loftin*, 146 N.J. 295, 390, 680 A.2d 677 (1996).

Defendants argue that the responses of approximately one-quarter of the total juror pool revealed some knowledge of the connection between the Vazquez and Olivares murders from outside sources. From this unadorned statistic, they contend that the entire venire was poisoned by extensive evidence of prejudicial pretrial publicity on the related murders and street gang violence. They further argue that prospective jurors knew defendants Scott and Russell had been found guilty of murder in the Olivares trial.

> Contrary to defendants' assertions, the record does not support these contentions. The jury pool was sufficiently large to allow the court to find twelve impartial jurors and four alternates. We disagree that there was actual prejudice, or that prospective jurors knew Russell and Scott had been convicted in the prior case. The denial of the motion to change venue was correct.

*Russell*, No. A-4101-09T1, slip op., at 25-30.

A criminal defendant has a right to "a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Jurors are not required, however, to be totally unaware of the facts and issues involved in a case. *Murphy v. Florida*, 421 U.S. 794, 799-800 (1975). "It is sufficient if the juror can lay aside his [or her] impression or opinion and render a verdict based on the evidence presented in court." *Id.* (quoting *Irvin*, 366 U.S. at 723). A defendant can establish actual prejudice by presenting evidence to show that "those who actually served on his [or her] jury lacked a capacity to reach a fair and impartial verdict based solely on the evidence they heard in the courtroom." *Rock v. Zimmerman*, 959 F.2d 1237, 1253 (3d Cir. 1992), overruled on other grounds by *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

However, "where media or other community reaction to a crime or a defendant engenders an atmosphere so hostile and pervasive as to preclude a rational trial process, a court reviewing for constitutional error will presume prejudice to the

defendant without reference to an examination of the attitudes of those who served as the defendant's jurors." *Riley v. Taylor*, 277 F.3d 261, 299 (3d Cir. 2001). "The community and media reaction, however, must have been so hostile and so pervasive as to make it apparent that even the most careful voir dire process would be unable to assure an impartial jury. . . . Such cases are exceedingly rare." *Id.*

To determine whether trial publicity has prejudiced the jury, courts must: (1) determine whether the news coverage is prejudicial; (2) if so, determine whether any jurors were exposed to the coverage; and (3) if exposure did occur, the court examines the exposed jurors to determine if this exposure compromised their impartiality. *Barry v. Bergen Cnty. Prob. Dep't*, 128 F.3d 152, 163 (3d Cir. 1997).

Here, the Appellate Division did not unreasonably apply federal law in rejecting this claim. First, the Appellate Division addressed the issue of presumed prejudice, finding that "this case is not one of these rare situations where prejudice is presumed due to a circus-like inflammatory atmosphere." *Russell*, No. A-4101-09T1, slip op., at 28. While Petitioner alleges there were fifty-four articles from the Asbury Park Press and other newspapers regarding the two murders, the Appellate Division explained there was no evidence of extreme community hostility and that the jurors only had a vague recollection of the underlying facts of the Olivares murder trial. *Id.* at 29.

Second, the Appellate Division addressed the issue of actual prejudice. The trial court questioned every juror who indicated they had knowledge of the Oliveras murder trial, including their source of information and their ability to remain impartial. *Id.* The Appellate Division explained that the trial court excused any potential juror who revealed an inability to be impartial. *Id.* Petitioner cites to the comments from jurors regarding their recollection of the Oliveras murder, but the Appellate Division found that with fifty-one out of a total of two hundred jurors indicating that they were familiar with the Olivares murder and its connection to Petitioner's trial here, the jury pool was "sufficiently large to allow the court to find twelve impartial jurors and four alternates." *Id.* at 30. The Appellate Division addressed both presumed and actual prejudice and found this claim meritless. Because the state court's rejection of this claim does not violate clearly established federal law, nor was it an unreasonable application of Supreme Court precedent, this claim is denied.

### B. Ground Two

In Ground Two, Petitioner argued that the trial court erred in "denying severance and not ordering a separate trial for defendants." (ECF No. 8 at 10.) Petitioner argues that severance should have been granted because "various hearsay statements would be introduced at [Petitioner's] trial that [Petitioner] would have no ability to cross-examine." (*Id.*) Petitioner also argues that the position of a co-

defendant was inconsistent with Petitioner's and an antagonistic defense developed at trial. Petitioner claims co-defendant Reeves admitted during the trial that he was the shooter, and that testimony would not have been a part of Petitioner's trial had the trial court severed the matters. (*Id.*)

Petitioner raised this claim on direct appeal and the Appellate Division found it meritless based on the following reasoning:

> Courts generally hold that defendants cannot be tried together when their defenses are antagonistic and mutually exclusive or irreconcilable. [*State v. Brown*, 118 N.J. 595, 605, 573 A.2d 886 (1990).] However, the mere existence of some antagonism, hostility or conflict between defendants is not sufficient. *Id.* at 606. Moreover, "'[i]f the jury can return a verdict against one or both defendants by believing neither, or believing portions of both, or, indeed, believing both completely, the defenses are not mutually exclusive.'" *Brown*, *supra*, 170 N.J. at 160 (alteration in original).

> . . .

> [T]here were no antagonistic defenses raised. Although Reeves admitted being the shooter, he claimed that Powell gave him the order to kill. Thus, Reeves's testimony in some ways benefited both [Petitioner] and Cochran. Moreover, the defenses were not mutually exclusive or irreconcilable. Indeed, the jury found [Petitioner] guilty on all counts, but found Cochran guilty only on the counts involving witness tampering.

> [Petitioner] contends that severance was warranted in part because of "confrontation concerns." He argues that the admission of various statements by co-defendants, who did not testify at trial, violated his confrontation rights because he was unable to cross-examine them. Notably,

[Petitioner] fails to support this argument with any persuasive legal authority.

Criminal defendants have the constitutional right to confront witnesses against them. U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10; *State v. Branch*, 182 N.J. 338, 348, 865 A.2d 673 (2005). "The right of confrontation is an essential attribute of the right to a fair trial, requiring that a defendant have a 'fair opportunity to defend against the State['s] accusations.'" *Ibid.* (quoting *State v. Garron*, 177 N.J. 147, 169, 827 A.2d 243 (2003), cert. denied, 540 U.S. 1160, 124 S. Ct. 1169, 157 L. Ed. 2d 1204 (2004)). This right is exercised through cross-examination. *Ibid.*

The Confrontation Clause prohibits the use of an out-of-court testimonial hearsay statement unless the person who made the statement is unavailable to testify at trial and the defendant had a prior opportunity for cross-examination. *State v. Cabbell*, 207 N.J. 311, 329- 30, 24 A.3d 758 (2011). The United States Supreme Court explained:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose . . . is to establish or prove past events potentially relevant to later criminal prosecution.
>
> [*Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 2273-74, 165 L. Ed. 2d 224, 237 (2006).]

For confrontation purposes, testimonial statements include those in which witnesses "bear testimony" against the accused by making "a formal statement to government

23

officers," *Crawford v. Washington*, 541 U.S. 36, 51, 124 S. Ct. 1354, 1364, 158 L. Ed. 2d 177, 192 (2004), as well as certain statements that are the product of police interrogation. *See Cabbell*, *supra*, 207 N.J. at 329.

It is well established that the co-conspirator exception does not offend a defendant's constitutional right to confront witnesses. *State v. Savage*, 172 N.J. 374, 402, 799 A.2d 477 (2002). To qualify for admission, however, the State must show:

> First, the statement must have been made in furtherance of the conspiracy. Second, the statement must have been made during the course of the conspiracy. Lastly, our courts have held that there must be evidence, independent of the hearsay, of the existence of the conspiracy and defendant's relationship to it.
>
> [*State v. Phelps*, 96 N.J. 500, 509-10, 476 A.2d 1199 (1984) (citations omitted).]

A co-conspirator's statement, therefore, is admissible if corroborated with sufficient independent evidence that engenders a strong sense of its inherent trustworthiness. *Savage*, *supra*, 172 N.J. at 403; *see also State v. Boiardo*, 111 N.J. Super. 219, 230, 268 A.2d 55 (App. Div.) (holding hearsay statements by codefendants in furtherance of a conspiracy in which the defendant was a participant did not violate the defendant's Sixth Amendment right to be confronted by witnesses against him), certif. denied, 57 N.J. 130, 270 A.2d 33 (1970), cert. denied, 401 U.S. 948, 91 S. Ct. 931, 28 L.Ed. 2d 231 (1971).

Here, the statements of [Petitioner's] co-defendants were admissible under the co-conspirator exception to the hearsay rule. Notably, these were not statements made to the police; rather, they were statements made to other

members of the conspiracy. For example, during a recorded conversation with Powell on October 9, 2008, [Petitioner] asked if Powell had the chance to "hit 'Brave [Cochran]'" to let him "know that, that shit gotta be done by Sunday, Monday the latest cause niggers go to Court Tuesday." Powell testified that he knew [Petitioner] was talking about the targeted witness. Reeves's testimony corroborated these statements by Russell and Powell regarding the witness. Thus, co-defendants' statements were made in furtherance and during the course of the conspiracy in which [Petitioner] was a participant, and their introduction at trial, did not violate his right of confrontation. Accordingly, there was no basis to sever the trials.

*Russell*, No. A-4101-09T1, slip op., at 32-40.

Initially the Court notes that Petitioner raises a claim of trial court error based on a failure to sever, which does not implicate any federal constitutional or statutory rights. Petitioner is arguing that the trial court's decision was an abuse of discretion, that state-law claim is denied because it is not cognizable. *See*, *e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Here, the Appellate Division's determination that the statements made by Petitioner's codefendants were admissible as statements between co-conspirators, made in furtherance of a conspiracy, is an evidentiary decision of state law that is binding on federal habeas review. *See Estelle*, 502 U.S. at 67-68. The Supreme Court has held that the admission of a non-testifying co-conspirator's statement against a defendant does not violate the Confrontation Clause as interpreted by *Bruton v. United States*, 391 U.S. 123 (1968), as long as the statement satisfies the co-

conspirator exclusion of the relevant rules of evidence. *See Bourjaily v. United States*, 483 U.S. 171, 182-83 (1987); *Ayers v. Akinbayo*, No. 15-1081-LPS, 2019 WL 1332325, at *4 (D. Del. Mar. 25, 2019) ("Notably, statements made by co-conspirators during the course of a conspiracy are non-testimonial.") Thus, Petitioner's claim that the trial court erred in not severing his trial based on his co-conspirators statements made in furtherance of the conspiracy is meritless.

To the extent that it is Petitioner's intent to challenge the trial court's decision on the federal constitutional grounds, "[t]here is a preference in the federal system for joint trials of defendants who are indicted together" because joint trials "promote efficiency and 'serve the interest of justice by avoiding the scandal and inequity of inconsistent verdicts." *Zafiro v. United States*, 506 U.S. 534, 537 (1993). "Joint trials conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial." *United States v. Lane*, 474 U.S. 438, 448 (1986).

The Supreme Court has observed that "[i]mproper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." *Lane*, 474 U.S at 446 n. 8. Denial of a motion to sever violates due process "only if there is a serious risk that a joint trial would

compromise a specific right of . . . the defendant[ ], or prevent a jury from making a reliable judgement about guilt or innocence." *Zafiro*, 506 U.S. at 539.

The potential for such a risk may arise when co-defendants assert "mutually antagonistic" defenses. *United States v. Voigt*, 89 F.3d 1050, 1094 (3d Cir. 1996) (citing *Zafiro*, 506 U.S. at 538). Significantly, mutually antagonistic defenses are not prejudicial per se, so as to require severance. *Zafiro*, 506 U.S. at 538. Mutually antagonistic or irreconcilable defenses may be so prejudicial in some circumstances that severance is mandated. *Zafiro*, 506 U.S. at 538. The Supreme Court has explicitly declined to adopt a bright line rule mandating severance whenever co-defendants have conflicting defenses. *Id.* District courts should grant severance "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539.

Here, Petitioner appears to argue that codefendant Reeves's defense was antagonistic to Petitioner's because Reeves admitted during trial that he was the shooter. However, the Appellate Division reviewed that argument and found that there were no antagonistic defenses raised. The state court explained that although Reeves admitted being the shooter, he claimed that Powell gave him the order to kill. Thus, Reeves's testimony in some ways benefited Petitioner. Moreover, the defenses were not mutually exclusive or irreconcilable. Petitioner has failed to show

27

that codefendant Reeves admission was antagonistic or that it prevented the jury from making a reliable judgment as to Petitioner's guilt. Petitioner cannot demonstrate the state court's adjudication was an unreasonable application of clearly established federal law.  Thus, Petitioner's claim is denied.

### C.  Ground Three

Petitioner's third ground for habeas relief alleges that the prosecutor committed a *Batson*/*Gilmore*[3] violation by excusing the only black juror left on the panel at that time. (ECF No. 8 at 11-12.)

*Batson* set forth a three-step inquiry to determine the constitutionality of a peremptory strike. First, "the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race." *Rice v. Collins*, 546 U.S. 333, 338 (2006). If this showing is made, then "the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question." *Id.* "Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination." *Id.* The court must evaluate "the persuasiveness of the justification" offered by the prosecutor, but "the ultimate burden of persuasiveness regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Id.* The Supreme Court explained the trial court's role at step three of the *Batson* inquiry:

---

[3] *Batson v. Kentucky*, 476 U.S. 79 (1986); *State v. Gilmore*, 103 N.J. 508 (1986).

The trial court has a pivotal role in evaluating *Batson* claims. Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility, *see* 476 U.S., at 98, n. 21, 106 S. Ct. 1712, and "the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge," *Hernandez*, 500 U.S., at 365, 111 S. Ct. 1859 (plurality opinion). In addition, race-neutral reasons for peremptory challenges often involve a juror's demeanor (e.g., nervousness, inattention), making the trial court's firsthand observations of even greater importance. In this situation, the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor. We have recognized that these determinations of credibility and demeanor lie "'peculiarly within a trial judge's province,'" *ibid.* (*quoting Wainwright v. Witt*, 469 U.S. 412, 428, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985)), and we have stated that "in the absence of exceptional circumstances, we would defer to [the trial court]," 500 U.S. at 366, 111 S. Ct. 1859 (plurality opinion).

*Snyder v. Louisiana*, 552 U.S. 472, 477 (2008).

On direct appeal, the Appellate Division explained that the juror in question was the only African-American juror on the panel at the time in question. *Russell*, No. A-4101-09T1, slip op., at 41. The Appellate Division explained the following:

The juror told the court that she could consider the evidence and the law with an open mind. She added:

[F]irst of all, you have to understand what the evidence is presented and if the evidence is not, you know, strong enough to prove the case, then how could you say the person is guilty or not guilty. First you have to

> understand both sides because there are three
> sides to every story. There is the truth of their
> story and then there is the truth of someone
> else's story and the truth lies in the middle.

The juror believed that she could serve well, explaining:

> This is my first time I've ever been called as
> a juror, but I understand that you are
> supposed to be tried by your peers and your
> peers are supposed to look like you so just
> looking at the jurors, I am the only one that
> looks like the people who are being tried so I
> feel that there needs to be a balance.

When asked what she considered the most important
constitutional protection, she replied that "speaking as a
black woman, everyone is entitled to their rights and that
means a fair trial." She continued:

> That means to be treated as human beings
> regardless of your color and I feel that this is
> the most important here in America because
> black people have struggled for so many
> years without having their rights and I feel
> that it's most important we should keep that
> right.

The juror, who was a teacher in the Newark school system,
did not believe that every individual in a street gang was
involved in criminal activity, explaining that she had
students in her class who were involved with street gangs
and nonetheless went on to graduate. When asked if she
would have any difficulty returning a guilty verdict, she
answered with a question, "[b]eyond a reasonable doubt,
and the State proved it"? She then responded, "I wouldn't
have a problem convicting as long as I heard both sides."

*Id.* at 41-42. The following day, before continuing voir dire, the state informed the court that it would seek to exercise a peremptory challenge to excuse the juror. *Id.* Defense counsel moved to preclude the juror's removal. Defense counsel noted that only two African American jurors had been called to the jury box and the court dismissed the other for cause. *Id.* at 43. The Appellate Division summarized the prosecutor's response as follows:

> The prosecutor argued that he did not use a peremptory challenge to remove the other prospective African American juror, and that he wanted to excuse the second such juror because of her views and ***opinions***, not her race. Specifically, he objected to her comment that there were "three sides to every story," which he thought suggested an unwillingness "to accept the evidence of one side or another." When asked, "if the State were to prove the charges beyond a reasonable doubt, would [she] have any difficulty returning a guilty verdict," the prosecutor noted, "she hesitated, perceptibly for three, four or five seconds," and then answered with a question. Based on his experience, the prosecutor believed that if she had to think about the question, she should not be on the jury.

He then added:

> And then she says, after I asked her if she heard what [was] the definition of reasonable doubt, she says, I wouldn't have a problem convicting as long as I heard both sides. Well, Judge, there may very well be only one side in this case, which again that leads me to believe that possibly she's going [to] think these defendants are not getting a fair trial, that they were prevented from telling their side if they exercise their right not to testify which is

31

perfectly their right. But I have some serious
reservations about whether this lady would
be willing to evaluate evidence, take it really
for what it's worth, talk to the other jurors,
and come to a verdict based on what she hears
in the courtroom.

I only need a slight bias to exercise a
peremptory challenge, Judge, and I have a
feeling that that's here in this case. The only
answer she should have given to that question
about [whether she would have] any
difficulty on a verdict is no and that's not the
answer we got and that's not acceptable to the
State.

*Id.* at 43-45. The trial court found no *Batson* violation. *Id.* at 45. It found that the

defendants failed to make a prima facia showing that the state's challenge was

exercised on the basis of race. *Id.* The court considered the state's practice of

exercising its peremptory challenges and did not find defendants had established a

pattern of group bias. *Id.* The Appellate Division explained that the four other

potential jurors of African-American descent had been dismissed for good causes,

including: "one male and one female, who had financial hardships; another male,

who had a family member with a pending criminal matter in Ocean County; and

another female, who had requested to be excused from the case because she lived

near one of the defendants and felt uncomfortable." *Id.*

The Appellate Division affirmed the trial court's finding that defendants failed to make a prima facia showing that the state's challenge was exercised on the basis of race. *Id.* at 47-48. The Appellate Division found:

> The court had previously excused, without objections, four prospective persons of color for cause. The State provided a non-pretextual and reasoned basis for the challenge. The record is bereft of evidence that the State was in engaged in a clear pattern of group bias by the prosecutor.
>
> Although the challenge removed the only African-American juror as of that point, this fact alone was insufficient to demonstrate the existence of an inference of discrimination. *See State v. Bey*, 129 N.J. 557, 584-85, 610 A.2d 814 (1992) (no prima facie showing where prosecutor exercised one peremptory challenge against the only remaining African-American juror and four against non- African-American jurors, and where six African-American jurors had been excused for cause, including one on the motion of defense counsel), supplemented by 137 N.J. 334, 645 A.2d 685 (1994), cert. denied, 513 U.S. 1164, 115 S. Ct. 1131, 130 L. Ed. 2d 1093 (1995); *State v. Lewis*, 389 N.J. Super. 409, 420-22, 913 A.2d 157 (App. Div.) (no prima facie showing where prosecutor used peremptory challenges to exclude three African-American jurors, and two African-American jurors remained), certif. denied, 190 N.J. 393, 921 A.2d 447 (2007).

*Id.* at 47-48.

The prosecutor offered a race-neutral explanation for striking the juror in question. *Rice*, 546 U.S. at 338. The record regarding the juror's answers during voir dire supports the prosecutor's nonracial reasons. Petitioner has failed to prove the state court's decision to deny Petitioner's *Batson* claim was contrary to, or an

33

unreasonable application of *Batson* or that it based its decision on an unreasonable determination of the facts. Petitioner is not entitled to habeas relief on Ground Three.

### D.  Ground Four

In Ground Four, Petitioner argues that the trial court improperly allowed Lieutenant Bevacqui to testify as a gang expert when he was not qualified. (ECF No. 8 at 13.) Petitioner claims that Lieutenant Bevacqui's testimony was a net opinion, inflammatory, and unduly prejudicial. (*Id.*)

As an initial matter, Petitioner's arguments are again ground in state evidentiary rules. "Petitions alleging specific errors in state law do not present federally cognizable issues unless the violation is demonstrated to be of constitutional magnitude." *Quintana v. Adm'r*, No. CV 13-7135, 2017 WL 4329736, at *18 (D.N.J. Sept. 29, 2017) (citing *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law")). A federal court must defer to a state court's interpretation of its own rules of evidence and procedure. *Bisaccia v. Attorney General of New Jersey*, 623 F.2d. 307, 312 (3rd Cir.1980).

Federal standards enter into the analysis, however, when an alleged evidentiary error rises to the constitutional level. "Only when an evidentiary error deprives a [Petitioner] of 'fundamental fairness' in his criminal trial is the error considered to be of constitutional proportion and cognizable in federal habeas corpus

proceedings." *Bartholomay v. Beyer*, No. 91-5176, 1992 WL 184360, at *3 (D.N.J. July 13, 1992) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 642–43 (1974) (In Donnelly, the Court distinguished evidentiary issues from constitutional protections. "This is not a case in which the State has denied a [Petitioner] the benefit of a specific provision of the Bill of Rights, such as the right to counsel, or in which the prosecutor's remarks so prejudiced a specific right, such as the privilege against compulsory self-incrimination, as to amount to a denial of that right." *Id* at 642-43. (internal citations omitted)). To permit habeas relief, a state court's evidentiary decision must have been so arbitrary or prejudicial that it rendered the trial fundamentally unfair. *See Romano v. Oklahoma*, 512 U.S. 1, 12–13 (1994); *see also Keller v. Larkins*, 251 F.3d 408, 413 (3d Cir. 2001) (evidentiary error rises to the level of a Due Process violation only when "it was of such magnitude as to undermine the fundamental fairness of the entire trial").

There is no indication that the trial court's decision to permit the testimony of Lieutenant Bevacqui as an expert on gangs rendered Petitioner's trial fundamentally unfair.

The Appellate Division on direct appeal, summarized Lieutenant Bevacqui's testimony as follows:

> At trial, Bevacqui testified about the history, symbols, language, and street names associated with the Bloods street gang. He also testified about the street gang's organization, hierarchy, and rules, and explained certain

terms and expressions used by its members such as barbecue and Big Homey.

Bevacqui opined that all street gangs were criminal enterprises, and that most, but not all, of their members were criminals. To determine whether someone was associated with a criminal street gang, he explained that two of seven criteria listed in *N.J.S.A. 2C:33-29* must be present, including: self-admission; official statements by law enforcement; electronic communication; photographs with other gang members; gang colors; tattoos; and other indicia of gang activity such as hand signs. In his ***opinion***, defendants were members of the Bloods street gang because their tattoos, clothing, electronic communications, and hand signs met the statutory criteria.

Relying on his review of discovery documents, Bevacqui offered the ***opinion*** that Reeves had received a direct order to shoot Granados. He further believed that if Reeves failed or refused to follow that order he could have been disciplined - including being murdered - by the Bloods.

*Russell*, No. A-4101-09T1, slip op., at 50-51.

First, Petitioner argues that Lieutenant Bevacqui was not qualified to testify as an expert on gangs. Petitioner raised this issue on direct appeal and the Appellate Division affirmed the trial court's decision to admit Bevacqui's testimony. The Appellate Division explained:

If properly qualified, an expert may give street gang related testimony. *State v. Torres*, 183 N.J. 554, 559, 874 A.2d 1084 (2005). The Court has found that the structure, organization, and procedures of street gangs are beyond the ken of the average juror, and that such testimony may be helpful to a jury's understanding of the relevant issues at trial. *Id.* at 573. Thus, the State may offer properly qualified expert testimony to explain a defendant's role as

36

the leader of a street gang, provided it is limited to areas
that fall outside the jurors' common knowledge. *Ibid.*

*Russell*, No. A-4101-09T1, slip op., at 52. The Appellate Division then considered

whether Bevacqui qualified as an expert and found:

> At the N.J.R.E. 104 hearing, Bevacqui testified that he had
> been employed by the New Jersey State Police for over
> twenty-four years. Beginning in 1988, his duties included
> investigating and gathering intelligence on criminal street
> gangs. In April 1997, he was assigned to the Street Gang
> Unit, where he remained until January 2005, when he
> became the Assistant Bureau Chief of the Intelligence
> Management Unit.
>
> Throughout his career, Bevacqui worked with over a
> hundred confidential informants to gather information
> about street gangs, and also debriefed gang members and
> associates. He attended approximately twenty-five
> seminars or courses on street gangs, including a 1989
> conference in Atlantic City. Additionally, he participated
> as an instructor or speaker at seventy-five to one hundred
> seminars of this kind. From 1997 to 2007 or 2008, he
> reviewed street gang materials on a daily basis, and
> participated in surveillances and gang investigations.
> During that time, he became familiar with the Bloods
> street gang and its structure, organization, and methods of
> operation. Bevacqui authored articles on street gangs, was
> a member of the East Coast Gang Investigators
> Association and California Gang Investigators
> Association, and was twice previously qualified as an
> expert witness in criminal street gangs.
>
> The trial court did not abuse its discretion by finding that
> Bevacqui was qualified to testify as an expert on street
> gangs, including the Bloods. Like the investigator in
> *Torres*, Bevacqui had experience, training, and knowledge
> acquired over many years. His expertise came from
> various sources and was sufficiently reliable to assist the

> jury in understanding the evidence. *Torres*, *supra*, 183 N.J. at 579; *see State v. Frost*, 242 N.J. Super. 601, 615, 577 A.2d 1282 (App. Div.) (holding that a witness could acquire expertise by occupational experience), certif. denied, 127 N.J. 321, 604 A.2d 596 (1990).

*Russell*, No. A-4101-09T1, slip op., at 53-54.

Next, Petitioner argues that Lieutenant Bevacqui's testimony was unduly prejudicial. On direct appeal, the Appellate Division found the evidence relevant to Petitioner's trial and that it was not unduly prejudicial, stating the following:

> All relevant evidence is admissible, unless otherwise excluded. N.J.R.E. 402; *State v. Burr*, 195 N.J. 119, 126, 948 A.2d 627 (2008). Relevant evidence has "a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401. To determine relevancy, a trial judge must "focus on the 'the logical connection between the proffered evidence and a fact in issue.'" *State v. Covell*, 157 N.J. 554, 565, 725 A.2d 675 (1999) (quoting *State v. Hutchins*, 241 N.J. Super. 353, 358, 575 A.2d 35 (App. Div. 1990)). "Once a logical relevancy can be found to bridge the evidence offered and a consequential issue in the case, the evidence is admissible, unless exclusion is warranted under a specific evidence rule." *Burr*, *supra*, 195 N.J. at 127.

> A court may exclude relevant evidence if "its probative value is substantially outweighed by the risk of (a) undue prejudice confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence." N.J.R.E. 403. During the weighing process, however, a court may admit evidence with overwhelming probative value even if highly prejudicial provided the evidence is central to the case. *Green v. N.J. Mfrs. Ins. Co.*, 160 N.J. 480, 496, 734 A.2d 1147 (1999).

Here, the State offered Bevacqui's *opinion* on street gang hierarchy, customs, and language to show that defendants were all members of the Bloods, that Scott and [Petitioner] had the authority to order a murder, and that they had ordered the murder during phone conversations from the jail. This evidence was relevant to explain why Reeves would shoot a complete stranger. *See Torres*, *supra*, 183 N.J. at 573 (holding evidence about a defendant's gang involvement was admissible because it was relevant to show the connection between his actions as leader of the gang and the actions of other gang members who actually committed the murder) . . .

Notwithstanding the relevance of the evidence, a trial court must carefully weigh the expert testimony to determine whether it may be unduly prejudicial. *Torres*, *supra*, 183 N.J. at 580. . . .

The balancing test of N.J.R.E. 403 requires the State to establish that the probative value of the evidence is not outweighed by its apparent prejudice. *State v. Long*, 173 N.J. 138, 161, 801 A.2d 221 (2002). "The mere possibility that evidence could be prejudicial does not justify its exclusion." *Id.* at 164 (internal quotations marks omitted). Instead, evidence that is unduly prejudicial is excluded "only when its "probative value is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation' of the issues in the case." *State v. Koskovich*, 168 N.J. 448, 486, 776 A.2d 144 (2001) (alteration in original) (quoting *State v. Thompson*, 59mN.J. 396, 421, 283 A.2d 513 (1971)).

Here, evidence of defendants' gang membership was relevant to show motive, intent, and knowledge. However, because evidence of membership in a street gang is strongly suggestive of actual criminal activity, Bevacqui's testimony must also be analyzed as evidence of other crimes under N.J.R.E. 404(b). *State v. Goodman*, 415 N.J. Super. 210, 226-28, 1 A.3d 767 (App. Div. 2010) (holding

evidence of gang membership was admissible under N.J.R.E. 404(b) and [State v.] *Cofield* [,127 N.J. 328, 338, 605 A.2d 230 (1992) ]to prove motive). A trial court has discretion to determine the admissibility of other-crime evidence. *State v. Marrero*, 148 N.J. 469, 483, 691 A.2d 293 (1997). Because the trial court properly applied the *Cofield* analysis, we owe deference to its determination. *See Goodman*, *supra*, 415 N.J.Super. at 228.

N.J.R.E. 404(b) generally precludes the admission of evidence relating to other crimes or wrongs, except to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity of absence of mistake or accident when such matters are relevant to a material issue of dispute." In *Cofield*, the Court articulated a four- prong test:

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
> 2. It must be similar in kind and reasonably close in time to the offense charged;
> 3. The evidence of the other crime must be clear and convincing; and
> 4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[*Cofield*, *supra*, 127 N.J. at 338.]

Bevacqui's testimony was relevant to the issue of motive, which satisfies the first prong. Defendants were gang members at the time of Vazquez's murder and, therefore, the second factor is satisfied. Moreover, the evidence of street gang affiliation was clear and convincing thereby satisfying the third factor. *Goodman*, *supra*, 415 N.J. Super. at 230. Finally, the evidence of Defendants' gang affiliation was necessary to explain why Reeves shot and killed a stranger. Thus, any prejudice inherent in the testimony about defendants' gang membership was outweighed by its probative value. Although Reeves admitted at trial that he shot the victim, Bevacqui's

> testimony was needed to explain why the events unfolded the way they did. *State v. Jenkins*, 178 N.J. 347, 365, 840 A.2d 242 (2004) ("in deciding whether prejudice outweighs probative value, 'a court must consider the availability of other evidence that can be used to prove the same point'") (quoting *Long*, *supra*, 173 N.J. at 164).

*Russell*, No. A-4101-09T1, slip op., at 56-60.

While the issue of a fact-finder hearing evidence of gang affiliation to establish motive has not been addressed by the United States Supreme Court, other courts in this circuit have considered the matter and found the evidence to be very probative of motive. *See*, *e.g.*, *Munoz v. Grace*, 2007 WL 2323134 at *13 (E.D. Pa. Aug. 10, 2007) ("[E]vidence of Petitioner's gang membership was highly probative on the issue of motive to commit [gang retaliation] murder."); *see United States v. Carter*, 410 F. App'x 549, 552–53 (3d Cir. 2011) ("gang-affiliation evidence should be admitted only when it is solidly tied to some legitimate purpose other than a showing of a propensity to criminal conduct such as . . . motive"); *Goodman v. Nogan*, No. 16-4591, 2019 WL 6271815, at *12 (D.N.J. Nov. 25, 2019) ("While the issue of a fact-finder hearing evidence of gang affiliation to establish motive has not been addressed by the United States Supreme Court, other courts in this circuit have considered the matter and found the evidence to be very probative of motive." )

Finally, the Appellate Court denied Petitioner's argument that Lieutenant Bevacqui's testimony was a net opinion as follows:

N.J.R.E. 703 requires an expert opinion to be supported by facts or data in the record or of a type usually relied on by experts in the particular field. *Pomerantz Paper Corp. v. New Community Corp.*, 207 N.J. 344, 372, 25 A.3d 221 (2011). The corollary of N.J.R.E. 703 is the net opinion rule, which forbids the admission into evidence of an expert's conclusions that are unsupported by factual evidence or other data. *State v. Townsend*, 186 N.J. 473, 494, 897 A.2d 316 (2006). The net opinion rule requires an expert to give the "why and wherefore" of his or her opinion, not a mere conclusion. *Ibid.*

Here, Bevacqui gave reasons for all of his opinions. His conclusions were supported by factual evidence, years of experience, and logical connections to the present case. They were not net opinions. *See id.* at 495 (holding that expert's education, training and experience provided a sound foundation for her opinion about domestic violence, and that her conclusion was not a net opinion).

*Russell*, No. A-4101-09T1, slip op., at 63-64.

The state court's decision was not an unreasonable application of clearly established federal law. Here, Petitioner has not raised a valid constitutional violation, and the to the extent that he challenges the state court's application of state law, his claim fails. As explained above, state-court evidentiary rulings are not a basis for habeas relief unless the asserted error rises to the level of a federal constitutional violation. *See Estelle*, 502 U.S. 67–68; *see also Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("federal habeas corpus relief does not lie for errors of state law"). He has not established how the evidence of his gang membership, within the context of the case, violated his right to a fair trial. Here, the record reflects that

Lieutenant Bevacqui had significant experience and training in the matter of gangs, including on the job experience, seminars, and authoring articles. The Appellate Division explained that Bevacqui's testimony showed that Petitioner was a gang member with the authority to order a murder, and he had done just that during phone conversations from jail. The state court found this evidence was relevant to why Reeves would have shot a stranger. The link between Petitioner's gang affiliation and the victim's death was strong, thereby supporting that its probative value outweighed its prejudicial value. Petitioner has failed to show any error or unfairness, let alone a due process violation. *Riggins v. Nevada*, 504 U.S. 127, 149 (1992) ("[T]he Due Process Clause guarantees the fundamental elements of fairness in a criminal trial.") Therefore, Petitioner's fourth ground for relief is denied.

### E. Ground Five

Petitioner's fifth ground for habeas relief alleges that the trial court erred by permitting the prosecutor to use Petitioner's statement from his plea-cutoff hearing in the Olivares murder proceeding as substantive evidence against Petitioner in the instant case. (ECF No. 8 at 14-15.)

Petitioner raised this claim on direct appeal, and the Appellate Division denied it for the following reasons:

> At trial, the prosecutor sought to read a portion of a transcript from [Petitioner's] plea cut-off proceeding in the Olivares case. [Petitioner's] defense counsel objected, arguing that the prior statements were made in response to

questioning by the court, and were not admissions or declarations against interest. The prosecutor responded that the statements made at the plea cut-off hearing showed [Petitioner] had knowledge of discovery documents containing Granados's name and address. The court overruled the objection, and the information was provided to the jury.

N.J.R.E. 410 provides for the inadmissibility in any civil or criminal proceeding of "a plea of guilty which was later withdrawn, of any statement made in the course of that plea proceeding, and of any statement made during plea negotiations when either no guilty plea resulted or a guilty plea was later withdrawn." The purpose of this rule is to promote effective and fair plea bargaining by allowing the defendants to negotiate without fear that their statements will later be used against them. *State v. Brabham*, 413 N.J. Super. 196, 208, 994 A.2d 526 (App. Div.), certif. denied, 203 N.J. 440, 3 A.3d 1228 (2010).

The court did not err by allowing the State to introduce a portion of the transcript from [Petitioner's] plea cut-off hearing. The only statement attributed to [Petitioner] during the exchange was his acknowledgment that he had reviewed the discovery in the Olivares case with his attorney. This statement was not made as part of any plea negotiations. Because this statement was not made in connection with any plea bargaining process, considerations of fairness are not implicated by its use in a subsequent trial.

*Russell*, No. A-4101-09T1, slip op., at 87-88.

Petitioner again raises a state law evidentiary claim, which is not a cognizable claim for habeas relief. *See*, *Estelle*, 502 U.S. at 67-68. Petitioner fails to argue that the trial court admission of the portion of the transcript from Petitioner's plea cut-off proceeding violated any particular federal constitutional right. In order to state a

cognizable claim for habeas review that the trial court erred through the admission of Petitioner's statement, he must prove that the admission "undermined the fundamental fairness of the entire trial," because the "probative value of [the] evidence, though relevant, is greatly outweighed by the prejudice to the accused from its admission." *Han Tak Lee v. Glunt*, 667 F.3d 397, 403 (3d Cir. 2012) (citations omitted). The Appellate Division found that the trial court did not err in admitting the transcript, explaining that the statements were not made during any plea-bargaining discussions and the only part attributable to Petitioner was that he had reviewed discovery materials with his attorney. Petitioner fails to show how the prejudicial nature of his statement outweighed its probative value, and he, therefore fails to meet that standard. The record does not indicate that the admission of a statement that Petitioner had reviewed discovery materials caused such fundamental unfairness as to rise to the level of a due process violation. As such, Petitioner's fifth ground for habeas relief is denied.

### F. Ground Six

In Ground Six, Petitioner argues that there was "too much hearsay" from Petitioner's co-conspirators admitted against Petitioner. (ECF No. 8 at 16.) Petitioner alleges that the trial court admitted "too much evidence" of statements made by co-conspirator Reeves. (*Id.*) Petitioner claims state witnesses Wends Guzman, Nina Clark, James Wallace, Stephanie Tansley, Shuanita Fosky, and

45

Reinaldo Felicaiano were all permitted to testify as to statements made by co-conspirator Reeves regarding the murder of Christian Vivar Granados. (*Id.*) Petitioner alleges that the statements did not fall within the co-conspirator exception to the hearsay rules because they were made after the conspiracy was over and the admission of the statements violated his "constitutional confrontation rights." (*Id.*)

On direct appeal, the Appellate Division found this claim meritless. As discussed above, under New Jersey state law hearsay statements made by a co-conspirator are admissible against co-conspirator when "made at the time the party and the declarant were participating in a plan to commit a crime . . . and . . . made in furtherance of that plan." N.J.R.E. 803(b)(5). The state court explained:

> A statement made after the conspiratorial objective is completed is generally not admissible under the coconspirator exception. *Savage*, *supra*, 172 N.J. at 403. A conspiracy, however, may continue "if it is shown that a conspirator enlisted false alibi witnesses, concealed weapons, or fled in order to avoid apprehension." *Ibid.* Further, "statements relating to past events may be admissible if they are 'in furtherance' of the conspiracy and 'serve some current purpose, such as to provide cohesiveness, provide reassurances to a coconspirator, or prompt one not a member of the conspiracy to respond in a way that furthers the goals of the conspiracy.'" *Ibid.* (quoting *State v. Taccetta*, 301 N.J. Super. 227, 253, 693 A.2d 1229 (App. Div.), certif. denied, 152 N.J. 188 (1997)).

*Russell*, No. A-4101-09T1, slip op., at 65-66. The Appellate Division denied Petitioner's claim, finding that the admission of co-conspirator Reeve's statements

46

"did not unduly prejudice [Petitioner's] right to a fair trial" because none of Reeve's statement implicated Petitioner directly "in any conspiracy or substantive crime." *Id.* at 66. In fact, Reeves testified "at trial that he never met [Petitioner] and that [Petitioner] never gave him any kind of order or directive." *Id.*

The Sixth Amendment to the United States Constitution, and specifically its Confrontation Clause, guarantees criminal defendants the right to confront the witnesses against them. In *Bruton*, the Supreme Court explained that a defendant is denied his right to confront witnesses against him when a prosecutor presents a co-defendant's confession implicating the defendant at a joint trial, and the co-defendant does not testify. 391 U.S. at 126. The Court has reviewed the testimony of Wends Guzman, Nina Clark, James Wallace, Stephanie Tansley, Shuanita Fosky, and Reinaldo Felicaiano and while each witness discussed statements made to them by co-conspirator Reeves, none of the witnesses mention Petitioner or that Reeves said anything about Petitioner. (*See* ECF No. 30-15, at 172:1 to 184:15; ECF No. 30-16, at 7:23 to 29:13, 42:19 to 61:6, 123:18 to 133:14, and 150:1 to 161:4; ECF No. 30-17, at 22:1 to 66:12.) As such, co-conspirator Reeve's statements did not implicate Petitioner and did not violate his right to confront witnesses against him. The Appellate Division found the admission of Reeves's statements did not unduly prejudice Petitioner's right to a fair trial. The Court agrees that the admission of statements that do not implicate Petitioner did not render Petitioner's trial unfair.

47

Because the Appellate Division did not violate clearly established federal law in resolving Petitioner's Confrontation Clause claim, the Court denies relief on ground six.

### G. Ground Seven

In Petitioner's seventh ground for relief, he alleges that statements made by the prosecutor during summation rendered his trial unfair. (ECF No. 8 at 17-18.)

Petitioner first argues that the prosecutor "diluted the requirements of accomplice liability," "which requires that prosecution to prove that the accomplice shared the same mental intent as the principal" through the comment "'the State is not saying [Petitioner] had the authority to order' the killing of the witness but that '[Petitioner] had the motive to engage in this conspiracy to commit the crime and to aid and assist by mak[ing] phone calls to Joe Powell and to get information to Trish Cochran . . . .'" (ECF No. 8 at 17-18.) Petitioner next argues the prosecutor improperly noted that when Powell testified for the state, "not one defense counsel challenged Powell's statement that he was not Reeves' Big Homey." (*Id.* at 18.) Finally, Petitioner submits the prosecutor improperly "invited the jury to think about the 'hopes and aspirations' of the victim's daughter, trying to invoke sympathy for the victims from the jury." (*Id.*)

The Appellate Division denied this portion of Petitioner's claim as follows:

> An accomplice is a person "who acts with the purpose of promoting or facilitating the commission of the

substantive offense for which he is charged as an accomplice." *State v. Bielkiewicz*, 267 N.J. Super. 520, 527-28, 632 A.2d 277 (App. Div. 1993). "[T]o find a defendant guilty of a crime under a theory of accomplice liability, it must find that he 'shared in the intent which is the crime's basic element, and at least indirectly participated in the commission of the criminal act.'" *Id.* at 528 (quoting *State v. Fair*, 45 N.J. 77, 95, 211 A.2d 359 (1965)).

Among the many things the prosecutor told the jury, he said the following:

> [Reeves] committed the murder, Jamell Scott, [Petitioner], and Trishawn Cochran all had the same purpose and intent that Lee Reeves did when he stood there and pulled that trigger and killed Athelma Vazquez and that purpose was to intimidate and stop Christian Vivar Granados from testifying in the trial of [Petitioner] and Jamell Scott[.]

Contrary to [Petitioner's] assertions, and after review of the entire summation, we fail to see how and where the prosecutor misspoke to the extent of diluting the elements of accomplice liability. In fact, he argued to the jury that [Petitioner], Scott, and Cochran shared the same mental intent as Reeves. He also told the jurors that the court would instruct them on accomplice liability, and the court later did so.

[Petitioner] further argues that vicarious liability is limited to those acts that are reasonably foreseeable consequences of the original conspiracy, and implies that the prosecutor improperly suggested to the jury that it could impose co-conspirator liability on him for the commission of substantive crimes that were not reasonably foreseeable.

Here, the evidence pointed in the direction of defendants' efforts — in a conspiracy — to kill Granados to prevent

him from testifying at a trial involving Scott and [Petitioner]. Not only did the jury listen to Reeves's explanation for his conduct, it heard telephone calls tape-recorded before the murder in which [Petitioner] (1) instructed Powell "that shit gotta be done by Sunday, Monday the latest cause niggers go to Court Tuesday," (2) told Powell to "[h]andle that CVS thing" and (3) urged Powell to "throw a barbecue and speak about that shit." Powell and Bevacqui testified that the term barbecue in this context meant to have someone killed. Because the evidence showed that defendants contemplated murder, [Petitioner's] argument about the lack of evidence of reasonable foreseeability is unpersuasive. There was no error with respect to the prosecutor's comments during summation about accomplice and co-conspirator liability.

[Petitioner] and Scott contend the prosecutor improperly commented on the failure of defense counsel to cross examine Reeves about his Big Homey. [Petitioner] and Scott argue that this comment referred indirectly to their decisions not to testify, and impermissibly shifted the burden of proof to them.

The trial court found that defendants had no responsibility to cross-examine Powell, but concluded that any error did not "rise to the level" requiring a mistrial. The court instructed the jurors to disregard this statement and not to consider it whatsoever.

The Fifth Amendment forbids a prosecutor from commenting on a defendant's failure to testify because such comment would penalize a defendant's constitutional right against self-incrimination. *State v. Scherzer*, 301 N.J. Super. 363, 439, 694 A.2d 196 (App. Div.), certif. denied, 151 N.J. 466, 700 A.2d 878 (1997). A prosecutor may not comment on a defendant's testimonial shortcomings or refer indirectly to the failure of a defendant to present evidence, if such comment could only be referring to the absence of testimony by the defendant. *Id.* at 439-40; *State v. Irizarry*, 270 N.J. Super. 669, 675, 637 A.2d 965 (App.

Div. 1994). Thus, "[r]eversal is mandatory if the prosecuting attorney has unambiguously called attention to defendant's failure to testify in exercise of his [or her] fifth-amendment constitutional right." *State v. Williams*, 113 N.J. 393, 454, 550 A.2d 1172 (1988). Notwithstanding the foregoing, a prosecutor's reference to silence may also be cured by a trial court's timely and effective action. *Scherzer, supra*, 301 N.J. Super. at 441. A curative instruction is deemed adequate if there is no real possibility that the error led the jury to a verdict that could not otherwise be justly reached. *Ibid.*

In the present matter, the prosecutor made a single comment about defense counsel's failure to cross examine Powell on his statement that he was not Reeves's Big Homey. The prosecutor, however, did not discuss the significance of such a failure. A review of the record suggests that this comment was made in response to conflicting testimony between Powell and Reeves as to the identity of Reeves's Big Homey. Given the context of the prosecutor's comment, it is unlikely that it could have altered the outcome of the trial. Even if the prosecutor's remark could be interpreted to implicate [Petitioner's] right to remain silent, the court's curative instruction rendered the comment harmless.

[Petitioner] also argues for the first time on appeal that the prosecutor improperly invited the jury to think about the "hopes and aspirations" of the victim's daughter. This comment, however, was made in response to defense counsel's opening and closing arguments, and testimony in the record. We conclude that in the totality of the summation, and in light of the evidence, the comment had no capacity to unduly prejudice the jury.

*Russell*, No. A-4101-09T1, slip op., at 71-73.

Here, the Appellate Division did not unreasonably apply clearly established

federal law or unreasonably determine the facts in light of the evidence. A habeas

claim based on prosecutorial misconduct should be granted only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks and citation omitted); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). A prosecutorial misconduct claim is examined in "light of the record as a whole" in order to determine whether the conduct "had a substantial and injurious effect or influence" on the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993). Likewise, a "reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001).

Petitioner cannot meet the high standard for relief on his prosecutorial misconduct claim. Viewed in context, the prosecutor did not dilute the accomplice liability requirement that the accomplice share the same mental intent as the principal. Rather, as explained by the Appellate Division, the prosecutor explicitly noted that "Reeves committed the murder, Jamell Scott, [Petitioner] and Trishawn Cochran all had the same purpose and intent that Lee Reeves did when he stood there and pulled the trigger and killed Athelma Vazquez." (ECF No. 30-22 at 100:19-23.) In light of the record as a whole, the prosecutor did not imply to the jury that Petitioner was not required to have the same mental intent as Reeves.

The prosecutor's comment that "not one defense counsel challenged" Powell's statement that he was not Reeves' "Big Homey" did not "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden,* 477 U.S. at 181. Rather, the trial court noted that although Petitioner had no responsibility to cross-examine Powell, that statement did not rise to the level of requiring a mistrial. (ECF No. 30-23, at 104:21 to 105:1.) The trial court then gave the following curative instruction: [The defendants] have no responsibility to cross-examine Powell, so you should not consider that whatsoever." (*Id.*, at 106:6-9.) Considering the overwhelming evidence presented against Petitioner, including the tape-recorded calls that the Appellate Division summarized, in which Petitioner (1) instructed Powell "that shit gotta be done by Sunday, Monday the latest cause niggers go to Court Tuesday," (2) told Powell to "[h]andle that CVS thing" and (3) urged Powell to "throw a barbecue and speak about that shit," and considering the curative instruction given by the trial court, the Court does not find that the prosecutor's comment "had a substantial and injurious effect or influence" on the jury's verdict. *See Rolan v. Coleman*, 680 F.3d 311, 323-24 (3d Cir. 2012) (holding that in light of other evidence and curative jury instructions, prosecutor's potentially prejudicial comment did not deprive the petitioner of due process).

Read in context, the prosecutors comment that the jurors should consider the "hopes and aspirations" of the victim's daughter was a response to defense counsel's opening statement. The prosecutor said:

> Had to bite my lip in openings. Lee Reeves is asked to stand and he's introduced as a human being. From what we know in this case, he just should have been introduced as a cold blooded killer, because that is what he is.
>
> Lee Reeves, I had to hear, had hopes and aspirations. I bit my lip so hard I almost bled. Hopes and aspirations? What about Thelma Vazquez, what about her hopes and aspirations? What about her hopes and aspirations for her daughter, who came in and told us how she had to watch her mother di in front of her, what about those hopes and aspirations?

(ECF No. 30-23 at 90:12-23.) Defense counsel asked the jury to consider Reeves' hopes and aspirations and the prosecutor responded. The Appellate Divisions find that "in the totality of the summation, and in light of the evidence, the comment had no capacity to unduly prejudice the jury" did not involve an unreasonable application of the due process standard governing prosecutorial misconduct. Therefore, Petitioner is not entitled to habeas relief on Ground Seven.

### H. Ground Eight

In Ground Eight, Petitioner argues that his right to a fair jury trial was infringed based on two juror issues that arose during trial and deliberations. (ECF No. 8 at 19-20.) First, while the jurors were being escorted to the courtroom during trial, a man in the vicinity of the jurors said, "Guilty or not guilty, come on, let's

54

talk." (*Id.*) Second, during deliberations, Juror # 8 wrote to the trial judge informing him that Juror # 12 had researched on the internet the meaning of "rock star Jim Jones status" and had listened to the lyrics of rap artists "Jim Jones." (*Id.*)

Petitioner raised this claim on direct appeal and the Appellate Division found it meritless for the following reasons:

> The court questioned the juror who had reported the ["Guilty or not guilty, come on, let's talk."] comment. The juror described the person, who was also seen inside the courtroom. The juror discussed it with other jurors in the jury room, but stated that he or she could remain fair and impartial.
>
> . . .
>
> The trial court then questioned the remaining jurors to determine whether they heard the comment and if they could still be fair and impartial. Most of the jurors heard the comment, but each said it would not prevent them from being fair and impartial. Two jurors, who first heard about the comment in the jury room, also told the court that they could be fair and impartial. Some jurors, however, were upset or concerned by the comment, with one juror estimating the degree of concern at forty percent. Another juror told the judge that "some people might feel intimidated" but denied feeling that way himself, and said he considered it as just a "stupid remark." The court instructed all jurors not to have any further discussions regarding this incident.
>
> . . .
>
> The record does not support [Petitioner's] contention about jury intimidation. There is no evidence that any juror actually felt intimidated by the guilty-or-not-guilty comment. The one juror who speculated that others might

have been intimidated expressly denied feeling that way. Although some jurors were upset by the comment, everyone insisted that they could remain fair and impartial. Moreover, defense counsel did not request anyone's excusal, and the court promptly informed the jurors that the person who made the comment had nothing to do with the trial. Because there was no discernable jury impact from this mid-trial exposure to an extraneous comment, the court did not abuse its discretion by denying [Petitioner's] motion for a mistrial.

. . .

The juror who conducted the research was Juror 12. She freely admitted that she researched the phrases "Jim Jones" and "capo status," which had been uttered during the trial,[6] and looked at song lyrics, but denied listening to any songs. She told the jurors that based on the lyrics, it appeared that Jim Jones was "into drugs, looking good and nice cars. In other words, having nice things." She implied that "Jim Jones rock star status" meant that you wanted to look good. She said the information from the internet did not add to or contradict the evidence at trial. Juror 12 stated that she could disregard what she just learned, that she could reach a decision based solely on the evidence, and that she could be fair and impartial. She agreed to refrain from conducting any more research during the trial.

> [fn 6] During Powell's testimony, he explained a reference made by [Petitioner] in one of the intercepted telephone calls from Ocean County Jail. At one point in the conversation, [Petitioner] said, "Niggers try ya know what I mean Rock Star Jim Jones status." Powell explained that Jim Jones, a Bloods member, was a rapper with "capo status," which was a high-ranking position in the street gang.

56

The court then individually interviewed the remaining jurors, excluding the four alternates. When asked if they heard anyone mention internet research, six jurors confirmed hearing something about music or a rap song about "Jim Jones rock star status" or what it meant. One juror also heard something about "Master Ru." Four jurors did not hear any discussions about internet research.

All of the jurors told the court that they could disregard the information obtained from the internet, that they could reach a decision based solely on the evidence, and that nothing occurred that would prevent them from being fair and impartial. The court instructed them not to discuss the matter further.

. . .

Because defendants did not object at trial, we will not reverse unless we find plain error, namely, error "clearly capable of producing an unjust result." R. 2:10-2. Not any possibility of an unjust result will suffice; the possibility must be "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." [*State v. Macon*, 57 N.J. 325, 336, 273 A.2d 1 (1971).] Applying this standard, we conclude that, considering the swift and entirely appropriate involvement by the trial court, any error was harmless and does not warrant reversal. *See, e.g., State v. Sowell*, 213 N.J. 89, 97, 61 A.3d 882, 887 (2013).

The trial court implicitly found that the jurors exposed to the outside information were credible, and its determination is entitled to deference given the court's opportunity to observe their demeanor. [*State v. R.D.*, 169 N.J. 551, 559, 781 A.2d 37 (2001).] The court also gave defense counsel an opportunity to raise an objection after questioning of the jurors, but no one did. The jury resumed deliberations and reached a verdict without any further incident.

*Russell*, No. A-4101-09T1, slip op., at 82-87.

Petitioner fails to demonstrate that the Appellate Division's determination was contrary to, or an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). The Appellate Division's decision was consistent with federal law. The Sixth Amendment of the United States Constitution and principles of due process guarantee a criminal defendant in state court the right to a trial by an impartial jury. *Ristaino v. Ross*, 424 U.S. 589, 595 n.6 (1976). Trial judges, therefore, must be "ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). Nevertheless, "it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote," and the Sixth Amendment and due process "do[ ] not require a new trial every time a juror has been placed in a potentially compromising situation." *See id.* To that end, district courts have "wide discretion . . . [in] areas of inquiry that might tend to show juror bias." *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991). Here, the Appellate Division's determination that the trial court's actions fell within the wide discretion afforded to it in assessing the juror's possible impartiality was consistent with, and a reasonable application of, the aforementioned law. *See Mu'Min*, 500 U.S. at 427.

Petitioner also fails to demonstrate that the Appellate Division's decision was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(2).

Although Petitioner "disagrees" with the trial court's finding that the jurors could be fair and impartial, that finding is entitled to a presumption of correctness, *see* 28 U.S.C. § 2254(e)(1), and Petitioner fails to overcome that presumption with clear and convincing evidence. The trial court questioned each juror, and all stated they could fair and impartial. Accordingly, the Court will deny Petitioner relief on Ground Eight.

## I. Ground Nine

In Ground Nine, Petitioner argues that the trial court erred in allowing the state to admit direct connect call records that were not produced to the defense until mid-trial. (ECF No. 8 at 21.) Alternatively, Petitioner argues that the trial court erred by failing to grant an adjournment to allow his defense counsel to review the evidence. (*Id.*)

On direct appeal, the Appellate Division summarized the background of this claim and explained that during the direct examination of Steven Ehrnman, a supervisor for Sprint Nextel Corporation, the state sought to introduce call detail records showing "incoming and outgoing calls, time and duration" between Chochran and Reeves. *Russell*, No. A-4101-09T1, slip op., at 89. Cochran's defense counsel objected based on the late production of the call records. *Id.* The Appellate Division explained:

> The prosecutor explained to the court that he had spoken
> to a Sprint representative the previous evening and

confirmed that Sprint only documented outgoing direct connect calls. He then drafted a "CDW" (a communications data warrant) to obtain records from Cochran's phone. The appropriate judge signed the warrant, and the prosecutor received the records around 8:30 a.m. that morning and turned them over to Cochran's attorney when counsel arrived in court. The prosecutor explained that he sought the records to verify that Cochran's phone and Reeve's phone were in contact.

Cochran's attorney argued that the State had Reeves's records for weeks, and that the introduction of his client's call records hours before the State called prosecutor's investigator Casey Long to testify about them put the defense at a disadvantage. The court ruled that Ehrnman could finish his testimony for the sole purpose of identifying the call records as business records. It also ruled that defense counsel could have more time to review the records before Long addressed them, and advised counsel to let the court know if further time was needed. Cochran's attorney said that was fine. [Petitioner's] defense counsel did not object to the late discovery.

Later that same day, the State recalled Long to testify without objections by any defense counsel. Long stated that there were ninety-seven direct connect calls from Reeves's phone to Cochran's. He determined that there were also several contacts from Cochran to Reeves. Counsel for Cochran and [Petitioner] cross-examined Long about the call records.

*Id.* at 89-90. The Appellate Division New Jersey Rule 3:13-3(g), explaining the "rule permits a court to 'order such party to permit the discovery or inspection of materials not previously disclosed, grant a continuance or delay during trial, or prohibit the party from introducing in evidence the material not disclosed, or it may enter such other order as it deems appropriate.'" *Id.* at 91, citing R. 3:12-3(g). The court noted

that Petitioner failed to note why he "needed more time to review these records." *Id.* at 92. The Appellate Division explained there was amble opportunity to cross-examine Ehrnman and Long about the calls, and Petitioner's counsel only cross-examined Long primarily about calls between [Petitioner] and Powell and failed to ask any questions about direct connect calls between Cochran and Reeves. *Id.* The Appellate Division denied Petitioner's claim finding that the record does not indicate that Petitioner was disadvantaged in any way. *Id.*

Generally, the admissibility of evidence is a question of state law which is not cognizable under habeas review. *See Keller v. Larkins*, 251 F.3d 408, 416 n.2 (3d Cir. 2001) ("A federal habeas court . . . cannot decide whether the evidence in question was properly allowed under the state law of evidence."). "[T]he Due Process Clause does not permit the federal courts to engage in a finely-tuned review of the wisdom of state evidentiary rules." *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983) (citing *Spencer v. Texas*, 385 U.S. 554, 564 (1967)). The state courts are entitled to deference in their determinations regarding evidence and procedure. *See Crane v. Kentucky*, 476 U.S. 683, 690 (1986). Because habeas relief does not provide an avenue for relief based on alleged errors of state law, a habeas claim based on a state law evidentiary issue may only be raised where the petitioner can show that the admission of the evidence in question denied him due process by depriving him of

61

the "fundamental elements of fairness in [his] criminal trial." *Glenn v. Wynder*, 743 F.3d 402, 407 (3d Cir. 2014) (quoting *Riggins*, 504 U.S. at 149).

Here, the Appellate Division cited to New Jersey Rules of Evidence in reviewing the appropriateness of the admissibility of the call direct records. The state court found Petitioner was not disadvantaged by the admission of the records, noting the trial court informed the defense they could request more time with the records if they needed it and defense counsel had an opportunity to cross-examine the witnesses on the records. Petitioner fails to demonstrate that the state court's reasoned analysis of the decision to allow these items into evidence resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. The Court finds no clear error by the state court in applying state evidentiary rules and finds that Petitioner has failed to show that the state court's evidentiary rulings deprived him of "fundamental elements of fairness in [his] criminal trial." *Glenn*, 743 F.3d at 407. Therefore, Petitioner's ninth ground for habeas relief is denied.

### J.  Grounds Ten, Eleven, Twelve, and Thirteen

Ground Ten, subclaims A through I, and Grounds Eleven, Twelve, Thirteen, and Fifteen all raise claims of ineffective assistance of trial counsel. (ECF No. 8 at 22-38.) Petitioner alleges the following grounds for relief:

Ground Ten, subclaims A through I

A. [Trial counsel] did not investigate or call witnesses at trial to establish a defense based on implicating Tyleek Baker's attorney, Paul Bergrin, as the principal party responsible for arranging the murder of Christian Granados.

B. [Trial counsel] was ineffective because he did not contact six witnesses who could have supported Petitioner's defense, which was that the words he used in conversations between himself and codefendant Powell were about his sister (Tonya Wall) sneaking marijuana into the Ocean County Jail.

C. [Trial counsel] was ineffective for failing to object to the spelling of his nickname to the jury as 'Gorilla Gotti" rather than "Guerilla Gotti."

D. [Trial counsel] was ineffective for not challenging the State's interpretation of the recorded code words. EL Washburne was ineffective for not introducing the entire conversations between Joseph Powell and Petitioner.

F. [Trial counsel] was ineffective for not introducing Joseph Powell's letter to the jury.

G. [Trial counsel] was ineffective for not calling Devon Hardy as a witness.

H. [Trial counsel] was ineffective for not introducing the entirety of Powell's police interview statements at trial.

I. [Trial counsel] was ineffective for not revealing the State's alleged inconsistency regarding Powell's credibility.

Ground Eleven: [Trial counsel] failed to attempt to prevent the jury from hearing irrelevant character evidence, specifically, his gang affiliation.

63

> Ground Twelve: [Trial counsel] failed to excuse certain jurors who were biased against him during jury selection.
>
> Ground Thirteen: [Trial counsel] was ineffective for failing to ask for a mistrial following certain actions by the State that he argues constituted prosecutorial misconduct.
>
> Ground Fifteen: The prosecution not only suppressed evidence, but it lied to the jury and [trial counsel] did not nothing to prevent the lies.

(*Id.*)

The Sixth Amendment, applicable to states through the Due Process Clause of the Fourteenth Amendment, guarantees the accused the "right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The right to counsel is the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984).

A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied. *See Strickland*, 466 U.S. at 687. To establish an ineffective assistance of counsel claim, a petitioner must first prove "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. In analyzing counsel's performance, the court must be "highly deferential." *Id.* at 689. The Supreme Court explained:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstance of counsel's

64

> challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'

*Id.* (*quoting Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).  A convicted defendant asserting ineffective assistance must therefore identify the acts or omissions that are alleged not to have been the result of reasoned professional judgment.  *Strickland*, 466 U.S. at 690.  The reviewing court then must determine whether, in light of all the circumstances, the identified acts or omissions were outside "the wide range of professionally competent assistance."  *Id.*  It follows that counsel cannot be ineffective for declining to raise a meritless issue.  *See Premo v. Moore*, 562 U.S. 115, 124 (2011).

The second part of the *Strickland* test requires a petitioner to demonstrate that counsel's performance "prejudiced the defense" by depriving petitioner of "a fair trial, a trial whose result is reliable."  466 U.S. at 687.  To establish prejudice, a petitioner must show "there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different."  *Id.* at 694.

If a petitioner fails to satisfy either prong of the *Strickland* test, it is unnecessary to evaluate the other prong, as a petitioner must prove both prongs to

establish an ineffectiveness claim.  *Id.* at 697.  Moreover, "if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice…that course should be followed."  *Id.*

Because Petitioner's ineffective assistance of counsel claim is raised through a § 2254 petition, federal "review must be 'doubly deferential' in order to afford 'both the state court and the defense attorney the benefit of the doubt.'"  *See Woods*, 575 U.S. at 316 (quoting *Burt v. Titlow*, 571 U.S. 12, 15 (2013)); *see also Pinholster*, 563 U.S. at 190 ("[R]eview of the [State] Supreme Court's decision is thus doubly deferential."); *see also Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) ("[D]oubly deferential judicial review applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard . . . ."); *see also Yarborough v. Genrty*, 541 U.S. at 1, 6 (2003) ("Judicial review of a defense attorney . . . is therefore highly deferential--and doubly deferential when it is conducted through the lens of federal habeas.").  Indeed, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard."  *See Harrington v. Richter*, 562 U.S.86, 105 (2011).

The relevant state court decision for federal habeas corpus review is the last reasoned state court decision. *See Bond v. Beard*, 539 F.3d 256, 289–90 (3d Cir.

2008). These deferential standards apply "even where there has been a summary denial" by the state court. *Cullen v. Pinholster*, 563 U.S. 170, 187 (2011).

Here, Petitioner raised these claims on collateral appeal and the PCR court issued a lengthy and detailed opinion denying Petitioner's claims as meritless. (*See* ECF No. 30-42 at 44-59.) Petitioner appealed and the Appellate division affirmed the PCR court's decision and denied the claims. *Russell*, 2019 WL 2114762 at * 10-12. The Appellate Division is the last reasoned state court decision. The Appellate Division denied all of Petitioner's ineffective assistance of counsel claims, stating "[t]he PCR judge thoughtfully addressed each of [Petitioner's] arguments in her comprehensive written decision. After reviewing these arguments in light of the record and applicable legal principles, we conclude they are without merit. We affirm substantially for the reasons set forth in the PCR judge's comprehensive written decision." *Id.* at * 10. The Appellate Division added the following:

> Our review of the record reveals [Petitioner] has not established a prima facie case of ineffective assistance of counsel. He has not shown that his counsel's alleged errors caused the requisite prejudice. To establish prejudice, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors," a different verdict would have resulted. [*State v. Fritz*, 105 N.J. 42, 52 (1987)] (quoting *Strickland*, 466 U.S. at 694). The impact of counsel's alleged errors on a verdict turns primarily on the strength of the evidence against the defendant and how counsel's errors relate to that evidence. Where the case against the defendant is strong, counsel's performance, unless egregiously lacking, will not result in a different outcome. *See State v. Pierre*, 223 N.J. 560, 583 (2015)

> ("Important to the prejudice analysis is the strength of the evidence that was before the fact-finder at trial.").
>
> The evidence against [Petitioner] and his co-defendants was overwhelming. Applying these principles, [Petitioner] has failed to show a reasonable probability that, but for counsel's alleged errors, the jury would have reached a different verdict. Absent a showing of prejudice, [Petitioner] was unable to establish a prima facie case of ineffective assistance of counsel to warrant an evidentiary hearing or PCR. [*State v. Preciose*, 129 N.J. 451, 462 (1992)]; R. 3:22-10(b).

*Russell*, 2019 WL 2114762 at * 12.

The Appellate Division applied the correct standard announced in *Strickland* for analysis of Petitioner's ineffective assistance of counsel claims and found Petitioner could not meet the prejudice prong of *Strickland* based on the overwhelming evidence against Petitioner. Therefore, the only question on habeas review is whether the state court's application of the prejudice prong was unreasonable. It was not.

The Court has thoroughly reviewed the state court opinions in this matter and the lengthy record before the Court. Petitioner cannot show that but for the alleged ineffective assistance of counsel the outcome of Petitioner's trial would have been different. As explained at length above, in 2006 Petitioner was on trial for the murder of Jose Francisco Olivares. Christian Vivar Granados was the state's main eyewitness to the Olivares murder. (*See* ECF No. 30-13 at 22:22 to 24:11.) Mr. Granados had identified Petitioner and his codefendants by first name and nickname

and had picked all three of their photographs out of a photographic lineup. (*See id.*) The state provided Petitioner's trial counsel in the Oliveras murder trial with discovery, which included the name and address of witness Granados. (*Id.* at 23:17 to 24:6.) During Petitioner's plea-cut off hearing in the Oliveras murder trial, Petitioner acknowledged that he reviewed all of the discovery with his attorney. (*Id.* at 27:6-16, 29:23 to 30:1.) On October 7, 2008, the trial court informed Petitioner and his codefendants that witness testimony in the Oliveras murder trial was set to begin on October 14, 2008. (*Id.* at 26:3-13.) On October 14, 2008, the day witness testimony was set to begin, Thelma Vazquez was shot and killed in the same apartment where Mr. Granados was. (*Id.* at 26:23 to 27:4.)

During Petitioner's trial at issue here, pertaining to the murder of Thelma Vazquez, Sergeant Joseph Valenti testified regarding tape-recorded telephone calls made by Petitioner and his co-defendants from Ocean County Jail between October 8 and 14, 2008. (*See* ECF No. 30-14 at 46:13 to 87:5.) Sergeant Valenti testified that he recognized Petitioner's voice in the audio recordings and confirmed it was Petitioner by viewing videotapes that are made of all telephone calls in the jail. (*Id.* at 52:11-15, 53:15 to 54:5.) In a tape-recorded conversation from October 9, 2008, Petitioner was recorded telling Joseph Powell, "its gotta be done by Sunday, Monday the latest 'cause niggers go to court Tuesday, you dig." (*Id.* at 55:21 to 56:6.) The

Oliveras murder trial was set begin on Tuesday October 14, 2008, the day Thelma Vazquez was killed.

Joseph Powell testified that on September 13, 2008, he was instructed by Shawn Craighead, a fellow gang member then incarcerated in the Ocean County Jail, to contact gang leader Cochran. (ECF No. 30-15 at 22:17 to 23:25.) When Powell met Cochran a few days later, Cochran told Powell that he was about "to take care of some bitch," which Powell understood to mean an unnamed witness. (*Id.* at 24:18 to 25:22.) Cochran later confided that he had learned the witness's address – "in the Congress" - and if Powell spoke with Scott or [Petitioner], Powell should tell them Cochran was "still working on that problem." (*Id.* at 26:24 to 27:18.) The Appellate Division cited to a tape-recorded conversation between Petitioner and Powell on October 10, 2008, as follows:

> [Petitioner]: Big bro bust at you and told you tell "Brave"
> [Cochran] that shit?
> [Powell]: About the pants, right?
> [Petitioner]: Yeah.
> [Powell]: Word.
> [Petitioner]: Yeah, I know that like, that's like top priority, ya hear.
> [Powell]: Word, I told 'em I'd let him have that by Sunday and shit.
> [Petitioner]: Yeah, na, but ah, motherfucker ah, tell "Brave" ta ah, tell "Brave" "Big Bro" said, tell, tell "Brave" "Big Bro" said, "Handle that CVS thing[,]" ya heard?
> [Powell]: CVS thing ya said?
> [Petitioner]: Yeah.
> [Powell]: A-ight[.]

70

> [Petitioner]: He be knowin', he be knowin' what it is en
> shit.
> [Powell]: Word.
> [Petitioner]: Ya tell 'em niggers you know what I mean,
> throw, throw a barbeque and speak about that shit.
> [Powell]: No doubt.
> [Petitioner]: Yeah, Nig, niggers goin' have ta fight this war
> on Tuesday, ya heard?
> [Powell]: Yeah, I'm gonna be up there Tuesday.
> [Petitioner]: Yeah, I know that. Yeah, we just, we just
> wavy right now man. I mean I got this thing in neutral
> patiently waitin' (inaudible) know what I mean?
> [Powell]: Word.

*Russell*, No. A-4101-09T1, slip op., at 5-7. Powell testified at trial that barbecue

means to "fry somebody or send something hot somebody's way." (ECF No. 30-15

at 36:1-12.) Powell also testified that they were not talking about actual pants, but

rather they were discussing the witness. (*Id.* at 36:13-17.)

Co-defendant Reeves testified at trial that he was ordered to kill a witness.

(ECF No. 30-21 at 11:6-16.) Reeves admitted to shooting Thelma Vazquez but

testified that it "was an accident" and he thought she was Christian Viva Granados.

(*Id.* at 13:25 to 14:1; 21:19 to 22:8.)

To satisfy the second prong of the *Strickland* test, a petitioner must "show

there is a reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different." 446 U.S. at 694. "'A reasonable

probability is a probability sufficient to undermine confidence in the outcome' of the

proceeding." *Id.* Considering the overwhelming evidence against Petitioner,

Petitioner has failed to show that but for counsel's alleged ineffective assistance, the result of his trial would have been different. The state court's adjudication of Petitioner's ineffective assistance of counsel claims was not an unreasonable application of *Strickland*. Petitioner is not entitled to relief on Ground Ten, subparts A through I, and Grounds Eleven, Twelve, and Thirteen.[4]

### K. Ground Fourteen

Ground Fourteen alleges that Petitioner should be granted a new trial based upon the state's violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Petitioner claims the state "failed to disclose it was in possession of a letter that revealed that the only fact witness against [Petitioner], Joseph Powell, concocted the entire story against [him]." (ECF No. 8 at 34-37.) Petitioner argues that Powell sent a letter to the trial court, in which he stated that he only learned about the murder plot after Powell was incarcerated and Petitioner was in a different facility at that time, Powell expressed his willingness to turn on his co-defendants, and the evidence shows that the murder plot took place prior to Powell and Russell's recorded phone conversations. (*Id.* at 36.)

As an initial matter, it does not appear that the instant *Brady* violation claim was properly exhausted. On collateral appeal Petitioner raised this claim as an

---

[4] Ground Sixteen re-raises the same claim raised in Ground Ten, subclaim C. Ground Seventeen re-raises the same claim raised in Ground Ten, subclaim A. Ground Eighteen re-raises the same claim raised in Ground Ten, subclaims B and G. As such, the Court will not address them in a separate section, and they are denied for the reasons expressed above.

ineffective assistance of counsel claim for failing to introduce the Powell letter at trial. (*See* ECF No. 30-42 at 50.) Petitioner did not raise the claim that the state failed to disclose the letter in violation of *Brady*. However, the Court need not determine if the claim is properly exhausted because a habeas court can, if appropriate, deny a petitioner's unexhausted claims on the merits pursuant to 28 U.S.C. § 2254(b)(2). See § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *see also Mahoney v. Bostel*, 366 F. App'x 368, 371 (3d Cir. 2010). The Court's de novo review applies a more liberal standard in favor of Petitioner than AEDPA deference. *See Harrington*, 562 U.S. at 101-102. Applying this more generous standard of review though, Petitioner is still not entitled to habeas relief on this claim.

Under *Brady*, the State bears an "affirmative duty to disclose [material] evidence favorable to a defendant." *Kyles v. Whitley*, 514 U.S. 419, 432 (1995) (citing *Brady*, 373 U.S. 83.) "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). In *Strickler v. Greene*, the Supreme Court clarified that "[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence

must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  527 U.S. 263, 281–82 (1999).

Here, as noted by the PCR court in evaluating Petitioner's ineffective assistance of counsel version of this claim, whether the murder plot was complete prior to Powell's conversation with Petitioner is irrelevant. The state argued to the jury that Powell and Petitioner's conversations were for the purpose of conveying messages to help facilitate the murder plot, not to initially plan the murder. (*See* ECF No. 30-12 at 26:13-17 ("And you will also hear from Joseph Powell how he was an intermediary, a conduit for conversations and message from Jamell Scott and [Petitioner] to Trishawn Cochran, who is not in jail at the time.")) Additionally, the jury heard Powell testify that Powell's conversations with Petitioner were not for the purpose of planning the murder, rather they were for the purpose of relaying messages from Petitioner to Cochran regarding what was going on with the murder. (*See* ECF No. 30-15 at 106:12-25.)

Regarding Plaintiff's allegation that the Powell letter would have shown the jury that Powell had expressed his willingness to turn on his co-defendants, the jury was made aware of this information. Powell was thoroughly cross-examined regarding his police interview transcript and his offers to help the police if they would release him. (*See id.* at 85:3 to 88:5.) Defense counsel cross-examined Powell regarding several of his statements to police, including the following:

> Just work with me. Just try, just try to work with me, man.
> Like, whatever you want, I'm gonna give it to you, man.
> I'm telling you, I'm gonna give it to you, man. I'm letting
> you, they don't care about me. I'm a sing.

(*Id.*, at 86:12-16.)

The Powell letter was not exculpatory as required by *Brady*, as the evidence presented at trial and summarized throughout this Opinion shows that Petitioner's conversations with Powell took place after the initial murder plot and were for the purpose of conveying messages regarding the completion of the murder not the planning of it. Petitioner has also not shown there is a "reasonable probability" that the outcome of his trial would have been different if the jury had been shown the Powell letter. As explained above, the jury was given the information Petitioner claims is exculpatory through Powell's testimony at trial. Petitioner has failed to meet the standard to show a *Brady* violation occurred. Habeas relief is not warranted on Ground Fourteen.

### L. Ground Nineteen

In Ground Nineteen, Petitioner claims that the cumulative effect of all of his trial and appellate counsel's errors rendered both of their performances constitutionally deficient. (ECF No. 8 at 46.)

In order to constitute redressable "cumulative error," the deficiencies in a case must overall have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Hem v. Sullivan*, 601 F.3d 897, 917 (9th Cir.

2010) (*citing Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish actual prejudice." *Fahy v. Horn*, 516 F.3d 169, 205 (3d Cir. 2008) (internal quotations and citations omitted).

As discussed herein, Petitioner's claims were extensively reviewed and rejected on the merits by the state courts, and those decisions easily withstand review under AEDPA.  Petitioner's claims lack substantial merit.  Petitioner has failed to show that any of the alleged errors cast doubt over the proofs of Petitioner's guilt which were presented at trial.  Petitioner has failed establish any prejudice from the alleged trial errors and there was significant evidence of Petitioner's guilt.  Petitioner has not shown that the alleged cumulative errors had a substantial and injurious effect or influence in determining the jury's verdict.  *Fahy*, 516 F.3d at 205.  Based on all of the forgoing, Petitioner's nineteenth ground is denied.

## V.  CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that

76

jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

Here, Petitioner has failed to make a substantial showing of the denial of a constitutional right.  Thus, no certificate of appealability shall issue.

## VI.  CONCLUSION

For the above reasons, the § 2254 habeas petition is denied, and a certificate of appealability will not issue.  An appropriate Order follows.

Dated:  3/6/23

s/*Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.